## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHESAPEAKE BAY FOUNDATION, INC.,** ) | |
| a non-stock corporation, 6 Herndon Avenue, ) | |
| Annapolis, MD 21403, ) | **CIVIL ACTION No.** |
| ) | |
| **MARYLAND WATERMEN'S ASSOC., INC.,** ) | |
| a non-stock corporation, P.O. Box 436, ) | |
| Chester, MD 21619, ) | |
| ) | |
| **ANNE ARUNDEL COUNTY, MARYLAND,** ) | |
| a Body Corporate and Politic, 2660 Riva Road, 4th Floor, ) | |
| Annapolis, MD 21401, ) | |
| ) | |
| **ROBERT WHITESCARVER,** ) | |
| 120 Trimbles Mill Road, ) | |
| Swoope, VA 24479, ) | |
| **and** ) | |
| ) | |
| **JEANNE HOFFMAN,** ) | |
| 120 Trimbles Mill Road, ) | |
| Swoope, VA 24479, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY,** ) | |
| 1200 Pennsylvania Avenue, N.W., Washington, DC 20460 ) | |
| ) | |
| **ANDREW R. WHEELER,** ) | |
| **Administrator, United States Environmental** ) | |
| **Protection Agency,** ) | |
| 1200 Pennsylvania Avenue, N.W., Washington, DC 20460 ) | |
| ) | |
| **and** ) | |
| ) | |
| **COSMO SERVIDIO, Regional Administrator,** ) | |
| **United States Environmental Protection Agency** ) | |
| Region 3, 1650 Arch Street, Philadelphia, PA 19103-2029 ) | |
| ) | |
| **On behalf of** ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| **Defendants.** ) | |

1

# COMPLAINT

## INTRODUCTION

1.      The Chesapeake Bay Foundation, Inc., the Maryland Watermen's Association, Inc., Anne Arundel County, Maryland, Robert Whitescarver, and Jeanne Hoffman (hereinafter "Plaintiffs") bring this action pursuant to the Clean Water Act (CWA), 33 U.S.C. §1365(a)(2), the Administrative Procedure Act (APA), 5 U.S.C. §§ 551, *et seq.,* and the Chesapeake Bay Agreements, against Defendants the United States Environmental Protection Agency (EPA) and Andrew R. Wheeler, Administrator, on behalf of the United States of America, and Cosmo Servidio, in his official capacity as Regional Administrator for EPA Region 3, for their failure to perform obligatory duties and failure to abide by the terms and conditions of the CWA, the APA, and the Chesapeake Bay Agreements.  Plaintiffs seek declaratory and injunctive relief and costs of litigation, including attorney and expert witness fees.

2.      The Chesapeake Bay (the Bay) is North America's largest and most biologically diverse estuary, home to more than 3,600 species of plants, fish and animals.  For more than 300 years, the Bay and its tributaries have sustained the region's economy and defined its traditions and culture.  EPA and the nation have recognized the Chesapeake Bay as a resource of extraordinary productivity, worthy of the highest levels of protection and restoration.

3.      In 2010, EPA issued a Total Maximum Daily Load for the Chesapeake Bay and its tributaries (Bay TMDL).  The Chesapeake Bay jurisdictions (District of Columbia, Delaware, Maryland, New York, Pennsylvania, Virginia and West Virginia) adopted load

caps for discharges of nitrogen, phosphorous, and sediment.  Each jurisdiction was directed to issue Watershed Implementation Plans (WIPs) in three phases - 2010, 2012, and 2019 – that were to be designed to attain Bay water quality goals by 2025.

4.      EPA and the Bay jurisdictions agreed that EPA would oversee and evaluate TMDL progress by each jurisdiction and that EPA would take action(s) necessary to ensure that the Bay jurisdictions adhered to the terms of the Chesapeake Bay Agreement consistent with 33 U.S.C.§1267(g).

5.      In 2014, EPA and the Bay jurisdictions signed the fourth Chesapeake Bay Agreement.  The Agreement requires, among other things, that by 2025 the parties would "have all practices and controls installed to achieve the Bay's dissolved oxygen, water clarity/submerged aquatic vegetation and chlorophyll-a standards as articulated in the Chesapeake Bay TMDL document." 2014 Chesapeake Bay Agreement, Water Quality Goal.

6.      In 2019, Pennsylvania and New York submitted Phase III WIPs that, on their face, failed to attain levels of pollution reduction required by the Bay TMDL by 2025.  EPA approved these WIPs without significant change or changes to the Bay TMDL, ensuring that Bay water quality will not be restored by 2025.

7.      The failure of the United States to comply with the Chesapeake Bay Agreements and the Clean Water Act will lead to the continued degradation of water quality in the Chesapeake Bay.  EPA's failure to act has harmed the Bay's natural resources and the citizens of the Chesapeake Bay region who enjoy and use the Chesapeake Bay and its rivers and streams and make a living from its natural resources.

8.      The degradation of water quality in the Chesapeake Bay and its rivers and streams has harmed and will continue to harm the cultural, economic, and quality of life interests of all Chesapeake Bay watermen and their families.

9.      The degradation of water quality in the Chesapeake Bay and its rivers and streams has harmed and will continue to harm the aesthetic, educational, recreational, and restoration interests of the plaintiffs, their members, and their constituents.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction of this action pursuant to 33 U.S.C. § 1365(a)(2) and 28 U.S.C. § 1346(a)(2).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because EPA headquarters are located in Washington, D.C., a substantial part of the events or omissions giving rise to the claims occurred in Washington, D.C., and CBF maintains an office in this district at 1615 M Street, NW, Washington, DC.

12.     On May 18, 2020, Plaintiffs provided written notice as required by the CWA, 33 U.S.C. § 1365(b), to the United States of its violations of the CWA, the APA, and the Chesapeake Bay Agreements and Plaintiffs' intention to file suit.  The Notice Letter was provided to the Attorney General, the Administrator of EPA, and the Regional Administrator of EPA Region III.  The United States, including but not limited to the EPA, has not responded to Plaintiffs' letter nor has it commenced or diligently prosecuted a court action to redress the violations alleged in this complaint.  More than the requisite 60 days have passed since the Notice Letter was issued and this action may now go forward.

## PARTIES

13.     Defendant Andrew R. Wheeler is the Administrator of EPA.  Defendant EPA is the federal agency responsible for enforcing the environmental laws of the United States. The EPA is also the agency that issued the Bay TMDL and is a signatory to the Chesapeake Bay Agreements on behalf of the United States.  Thus, the United States is also a Defendant to this action.

14.     Defendant Cosmo Servidio is the Regional Administrator for the Mid-Atlantic Region (Region 3) of the EPA and the signatory on EPA's review and approval of Pennsylvania's and New York's Phase III Watershed Implementation Plans.  He is sued in his official capacity.

15.     Plaintiff Chesapeake Bay Foundation, Inc. (CBF) sues on its own behalf and on behalf of its members.  The CBF is a 501(c)(3), non-stock, Maryland corporation with offices in the District of Columbia; Annapolis and Easton, Maryland; Harrisburg, Pennsylvania; Richmond and Virginia Beach, Virginia.  CBF is the largest conservation organization dedicated solely to protecting the Chesapeake Bay watershed and its tributaries.  Since CBF's founding over 50 years ago, its goal has been to improve water quality in the Bay and its tributaries by reducing pollution.

16.     CBF is the only independent organization dedicated solely to restoring and protecting the Bay and its tributary rivers.  Its goal is to improve water quality by reducing pollution including nitrogen and phosphorous.  CBF's vision for the future is a restored Bay with healthy rivers and clean water; sustainable populations of crabs, fish, and oysters; thriving water-based and agricultural economies; and a legacy of successful protection and restoration of the Chesapeake Bay ecosystem for our children and grandchildren.

17.     CBF has approximately 300,000 members and during calendar year 2019, CBF had 4,810 active adult and student volunteers.  Approximately 6,000 members reside in the District of Columbia, 109,100 in Maryland, 47,000 in Pennsylvania, and over 91,400 in Virginia.  The majority of CBF's remaining members reside in the states of Delaware, New York, and West Virginia.

18.     CBF, several signatories of the prior Bay Agreements, and local stakeholders sued EPA to require the agency to develop the Chesapeake Bay TMDL. *Fowler v. EPA,* No. 1:09-C-00005-CKK, 2009 U.S. Dist. LEXIS 132084 (D.D.C. 2009). This matter resulted in a settlement agreement with the United States requiring EPA to, among other things, issue the Chesapeake Bay Total Maximum Daily Load by December 31, 2010.

19.     CBF participated extensively in the development of the Chesapeake Bay TMDL and the Bay jurisdictions' Watershed Implementation Plans—collectively the Chesapeake Bay Clean Water Blueprint. The TMDL required the Bay jurisdictions to develop watershed implementation plans that explained how the jurisdictions would meet the waste load and load allocations established in the TMDL. See, supra ¶ 3. Bi-annual milestones were set so EPA could track the progress of each jurisdiction in attaining its pollution limits.  CBF continues to participate in efforts to implement and refine the Blueprint throughout the Bay watershed. The Blueprint presents the best example of cooperative federalism working towards the goal of restoring the Bay. However, the Blueprint goals will only be met if EPA adheres to the requirements of the Clean Water Act and the Bay Agreements.

20.     The CBF operates sixteen (16) educational programs throughout the watershed that conduct student leadership projects, in-the-field educational experiences, and other activities to immerse students and teachers in the Bay and learn about the threats facing its

recovery. CBF operates several marine vessels in the Chesapeake Bay and its tributaries. CBF spends over $4 million a year on education programming throughout the Bay watershed, spending approximately $4.3 million this past fiscal year. CBF educators lead students and teachers on trips in wetlands areas, headwater streams, and other seasonal waters and wetlands to investigate macroinvertebrates and conduct water quality sampling. Polluted waters significantly affect the efficacy of these education trips. When waters are polluted educators and students limit contact with the water, thereby hampering the ability of students to investigate a given waterbody. The Defendants' failure to comply with the CWA, APA, and the Chesapeake Bay Agreements harms water quality and natural resources within the Bay and its tributaries harming CBF's ability to conduct these educational programs.

21. CBF operates the Susquehanna Watershed Environmental Program throughout Pennsylvania. Students travel by canoes on local creeks, rivers, or lakes to investigate the ecology, history, and geography of the Susquehanna River watershed and the Chesapeake Bay. This program introduces students to the complex relationship between land use and aquatic habitats, local water quality, and the health of the Bay. The EPA's failure to comply with the Clean Water Act harms water quality and natural resources within the Bay and its tributaries, which harms CBF's ability to conduct these educational programs.

22. CBF also conducts numerous advocacy and restoration programs within the Chesapeake Bay watershed designed to improve water quality in the Bay and its tributaries such as working with farmers to reduce runoff from agriculture, planting buffers along rivers and streams, and growing and planting oysters and underwater grasses. Over the previous fiscal year, CBF spent approximately $3.1 million on these programs in the Bay region. The Defendants' failure to comply with the CWA, APA, and the Chesapeake Bay Agreements

harms water quality and natural resources within the Bay and its tributaries, harming CBF's ability to conduct these restoration programs.

23.     CBF invests millions of dollars in restoration projects across the watershed, including in Pennsylvania. Notably, CBF initiated the Keystone 10 Million Trees Partnership, a collaborative effort of national, regional, state and local agencies, conservation organizations, outdoors enthusiasts, businesses, and citizens committed to improving Pennsylvania's communities, economy, and ecology by planting 10 million trees throughout the Commonwealth by 2025. See CBF, *Keystone Ten Million Trees Partnership*, https://www.cbf.org/how-we-save-the-bay/programs-initiatives/keystone-ten-million-trees-partnership.html (last visited July 28, 2020). In fiscal year 2020, CBF spent over $600,000 planting trees as part of the Keystone 10 Million Trees Partnership. As of April of 2018, CBF has planted over 203,000 trees across the Commonwealth.

24.     CBF operates an extensive oyster restoration program in Maryland and Virginia. CBF's restoration department engages in numerous oyster restoration projects designed to revive the Chesapeake Bay's native oyster population after decades of decline due to pollution, overharvesting, and disease. Current estimates place the Bay's native oyster population at a fraction of historic levels. By restoring the Bay's oyster population, CBF aims to harness oysters' filtering ability to improve both water quality and clarity in the Bay. These restoration efforts are frustrated by EPA's approval of Pennsylvania and New York's facially deficient WIPs that will not meet downstream water quality, which includes the mainstem of the Chesapeake Bay in Maryland and Virginia.

25.     CBF's oyster restoration projects include oyster plantings, population and habitat monitoring, project maintenance, and public education (including the oyster gardening

program). The primary restoration activity is planting juvenile oysters (or "spat") to build and enhance oyster reefs throughout the Bay. In 2019, CBF planted 6 million oysters in the Little Choptank River, 2 million at Fort Carroll on the Patapsco River, and 250 spat-covered reef balls in the South River. Additionally, CBF launched its Making History Campaign in 2018. As a part of the Campaign, CBF set a goal to achieve 10 billion more oysters planted in the Chesapeake Bay by 2025; and to restore and protect oyster populations in ten Chesapeake Bay watershed tributaries in accordance with the goals of the Chesapeake Bay Watershed Agreement. See U.S. EPA Chesapeake Bay Program, Chesapeake Bay Watershed Agreement, https://www.chesapeakebay.net/what/what_guides_us/watershed_agreement.

26.     CBF members are also harmed by EPA's failure to comply with section 117(g) of the Clean Water Act. CBF members enjoy swimming, kayaking, boating, sailing, fishing, crabbing, bird watching, and other aesthetic and recreational pursuits in the waters of the Bays and its rivers and streams. These members are fearful that EPA's actions will degrade downstream water quality, and therefore impair their interest in recreating in the Bay and its tributaries and streams, especially in the Commonwealth of Pennsylvania. CBF members are adversely affected by poor water quality in the Chesapeake Bay and its tidal tributaries. Thus, they are harmed by the failure of the Administrator to comply with the Clean Water Act, the Administrative Procedure Act, and the Chesapeake Bay Agreements.

27.     The Maryland Watermen's Association, Inc. (MWA) is comprised of the various waterman groups on both Maryland's eastern and western shores. MWA is a Maryland corporation whose members make a living crabbing, fishing, and harvesting oysters in the Chesapeake Bay and its tributaries.  Since 1973, MWA has served the interests of watermen and the seafood industry throughout the state of Maryland.  MWA works with state and

federal regulators, environmental groups and business associations to ensure the economic future of independent watermen and seafood businesses throughout the state. Members of MWA include working Maryland watermen who derive their living directly from the Chesapeake Bay and its tributaries. Polluted water flowing down the Susquehanna River adversely affects their jobs and economic viability. MWA and its members count on EPA and states to comply with their respective obligations under state and federal law as well as the Chesapeake Bay Agreement and the Bay TMDL.

28. The Defendants' failure to comply with the CWA, APA, and the Chesapeake Bay Agreements harms water quality and natural resources within the Bay and its tributaries and thus harms the ability of MWA's members to crab, fish, oyster, and make a living. The MWA sues on behalf of its members.

29. Anne Arundel County, Maryland, is a charter county in central Maryland that sits on the shores of the Chesapeake Bay. Anne Arundel County's 415 square miles of land includes over 500 miles of shoreline on the Chesapeake Bay and its tributaries. Its 580,000 residents and countless tourists are drawn to Anne Arundel County to enjoy the Bay, fresh seafood, and numerous water-based recreational opportunities. Travel and tourism spending in the County is estimated at over $3.5 billion annually, providing support for over 30,000 workers.

30. Anne Arundel County has invested more than $0.5 billion over the last decade to protect this vital natural, economic and cultural resource. The County's Watershed Protection and Restoration Program, established in 2016 and funded largely through a stormwater restoration fee charged to property owners, has invested $284 million to restore 13 stream channels, retrofit 85 stormwater ponds and repair 16 damaged stormwater outfalls. Since

2010, the County's Department of Public Works has invested $258 million to upgrade wastewater treatment plants to achieve enhanced nutrient removal, significantly lowering the amount of nitrogen and phosphorus entering the Chesapeake Bay.  Each of these actions and related expenses were taken and incurred as a result of Maryland's Watershed Implementation Plans which are designed to meet the pollution reductions required by the Chesapeake Bay TMDL.  EPA's failure to comply with the Bay TMDL and the Bay Agreements harms the County's efforts to achieve its pollution reduction goals and to see a restored Bay that covers over 500 miles of county shoreline.

31.     Robert Whitescarver and Jeanne Hoffman operate a farm in Swoope, Virginia. Over the last 15 years, they sold livestock raised on that farm to food processors. Mr. Whitescarver is a former Natural Resource Conservation Service representative who spent his career educating farmers on the benefits of protecting farmland and improving water quality in local streams and rivers. He also teaches a class on sustainable agriculture at James Madison University. Ms. Hoffman is a member of the CBF board of trustees and, like her husband, is an advocate for sustainably operated farms and restored water quality in the Chesapeake Bay.

32.     Ms. Hoffman and Mr. Whitescarver are strong supporters of the Chesapeake Bay Total Maximum Daily Load and recognize that local water quality is inextricably tied to water quality in the Chesapeake Bay. They have spent considerable time and effort fencing their livestock out of tributaries to the Middle River and the river itself which flows through their farm. They have also installed and continue to maintain streamside buffers by planting trees and vegetation on the farm. They also utilize sustainable grazing practices including rotational grazing and nutrient management. Their advocacy and sustainable farming efforts

11

are harmed by EPA's failure to require all of the Bay jurisdictions to meet their respective commitments under the Bay TMDL and the Chesapeake Bay Agreement.

33.     The individual Plaintiffs, the organizational Plaintiffs' and their members, and the County's residents use and enjoy the Chesapeake Bay and its tributary rivers into which pollutants have and continue to be discharged causing harm to the Plaintiffs.  The individual Plaintiffs, the organizational Plaintiffs and their members and residents of the County reside near and enjoy waters within the Bay Watershed for recreation, fishing, swimming, kayaking, boating, wildlife viewing, and scientific study.  The Administrator and the United States were charged by Congress and by the Chesapeake Bay Agreements to improve water quality and living resources within the Bay and its tributaries.  The failure of the Administrator and the United States to comply with the CWA, the APA, and the Chesapeake Bay Agreements has and continues to adversely affect and irreparably harm the aesthetic, conservation, economic, educational, recreational, and scientific interests of these individuals, organizations, and members, for which harm they have no adequate remedy at law.  The Plaintiffs and their respective members and residents will continue to be harmed until the Defendants fully comply with the CWA, the APA, and the Chesapeake Bay Agreements.  The relief sought herein will redress the harm to Plaintiffs.

**FACTS**

The Chesapeake Bay is a National Treasure

34.     The Chesapeake Bay is the largest estuary in the United States.

35.     The Chesapeake Bay begins at the mouth of the Susquehanna River in Pennsylvania and Maryland and enters the Atlantic Ocean approximately 200 miles south between Cape Henry and Virginia Beach, Virginia.

36.     The Chesapeake Bay watershed – the land area that contributes water to the Bay - covers 64,000 square miles from Cooperstown, New York to Virginia Beach, Virginia. Portions of the watershed are found in Delaware, Maryland, New York, Pennsylvania, Virginia, Washington, D.C., and West Virginia.

37.     Historically, numerous Native American tribes lived along the shores of the Bay and its tributaries surviving off the fertile land and the abundant natural resources of the Bay.

38.     Captain John Smith and members of the Virginia Land Company explored the reaches of the Bay during 1607-09.  Smith reported finding fish so plentiful that they could be caught in frying pans and speared with swords.  Oysters existed in such large numbers that they created hazards to navigation.

39.     Since the founding of Jamestown, Virginia, the Chesapeake Bay has been a tremendously important economic engine for the region.  Historically, tons of crabs, fish, and oysters were harvested from the Bay annually.  Numerous other species of Bay wildlife have been caught and sold to feed the citizens of the Mid-Atlantic region.

40.     The quality of the water in the Bay and its tributaries degraded as the population in the region grew.  The primary culprits for the degradation in water quality are nitrogen, phosphorous, and sediment pollution.  In general, nitrogen and phosphorus are nutrients essential for the growth of plant life, both aquatic and terrestrial.  In overabundance, however, these pollutants lead to the excessive growth of algae that die and decay – a process that blocks sunlight and sucks life sustaining oxygen from the water.

41.     As water quality in the Bay and its tributaries degraded, the amount of underwater grasses essential to the sustainability of crab and fish populations declined.  In addition, poor

water quality contributed to a dramatic loss of oysters and other aquatic life critical to a healthy Bay.

42.     Poor water quality and the consequential loss of crabs, fish, underwater grasses and oysters directly harmed and continues to harm commercial and recreational fishing.

43.     Congress has recognized that the Chesapeake Bay is a "national treasure and resource of worldwide significance."  Chesapeake Bay Restoration Act of 2000, Nov. 7, 2000, P.L. 106-457, Title II, § 202, 114 Stat. 1967.  The restoration and preservation of the Chesapeake Bay is essential for a healthy and vibrant economy.  The ports of Baltimore and Hampton Roads provide thousands of jobs and annually generate billions of dollars in revenue.  The town of Reedville, Virginia, on the Bay's western shore consistently records the second to third largest catch of fish in the nation.  The annual economic value of the Bay has been estimated at well over a trillion dollars.

44.     The Chesapeake Bay region is home to approximately 18 million people, many of whom rely on the Bay and its tributaries as not only a source of income but also as a place to recreate and commune with nature – a priceless commodity.  Moreover, some of our nation's most treasured historical places are located within close proximity of the Chesapeake Bay and its tributaries – Annapolis (Severn River), Antietam (Potomac River), Cooperstown (Susquehanna River), Jamestown and Williamsburg (James River), Yorktown (York River), and Washington, D.C. (Potomac and Anacostia Rivers).

45.     The United States has recognized that the value of the Chesapeake Bay is immeasurable.

The Chesapeake Bay Agreements

46.     During the 1970s, Bay grasses, and oyster, crab, and fish populations declined dramatically. The federal government realized that something had to be done to improve water quality in the Bay or this natural treasure would be lost.  In 1976, Congress directed U.S. EPA to undertake a comprehensive study of the Bay including water quality and its resources to determine how best to manage this national resource.  94 P.L.116.

47.     In 1980, Congress passed the Chesapeake Bay Research and Coordination Act (16 U.S.C. § 3001-3007).  In so doing, Congress found that the Chesapeake Bay "is one of the greatest natural resources of the United States of America."  The Act mandated that the Secretary of Commerce create an Office for Chesapeake Bay Research Coordination and create a research board comprised of members selected from the federal government, Maryland, and Virginia.  The board was to develop a research plan and coordinate federal research within the Bay area.  Congress appropriated $500,000 a year for four years to carry out these mandates.

48.     In 1980, Maryland and Virginia each adopted their own legislation recognizing and implementing an agreement to create the Chesapeake Bay Commission (the "Commission") to coordinate interstate planning and programs.  Pennsylvania signed similar legislation and joined the Commission in 1985.  This "tri-state agreement" marked the beginning of ongoing interstate legislative efforts to protect the estuarine habitat of the Chesapeake Bay.

49.     The Commission includes fifteen legislators (five from each state), three natural resource cabinet secretaries and three citizen representatives, one each from Maryland, Pennsylvania, and Virginia.

50.     The Commission is a signatory to all the Bay Agreements and amendments beginning in 1987 and is a member of the Executive Council of the Chesapeake Bay Program.  The Commission acts as the legislative arm of the Bay Program and each state's representatives advise their respective legislatures.

51.      The EPA (on behalf of the United States), Maryland, Virginia, Pennsylvania, and the District of Columbia signed the first Chesapeake Bay Agreement in 1983 (the "1983 Bay Agreement").

52.     The 1983 Bay Agreement created an Executive Council to assess and oversee implementation of coordinated plans, to improve water quality and the living resources of the Bay, and to establish an implementation committee to coordinate and evaluate management plans.  The Executive Council: establishes the policy direction for the restoration and protection of the Bay and its living resources; exerts leadership to marshal public support for the Bay effort; signs directives, agreements and amendments that set goals and guide policy for Bay restoration and; is accountable to the public for progress made under the Bay agreements.

53.     The 1983 Bay Agreement also created the Chesapeake Bay Program to act as a liaison between the parties to the Agreement and EPA's Bay restoration arm.  1983 Chesapeake Bay Agreement.  The United States Congress passes annual appropriations bills to fund the EPA Chesapeake Bay Program and other programs designed to ensure compliance with the Chesapeake Bay Agreements.

54.     In 1987, a subsequent interstate agreement was signed by the Administrator of EPA, on behalf of the United States, Maryland, Pennsylvania, Virginia, the District of Columbia, and the Chesapeake Bay Commission. (hereinafter referred to as the "1987 Bay

Agreement"). This agreement amended the 1983 Bay Agreement to include more specific quantitative goals and commitments. The most "critical element" of the 1987 Bay Agreement was the decision to mandate the reduction of point and non-point nitrogen and phosphorous pollution loadings to the Bay by 40 percent by 2000. To reach this goal, the parties agreed to develop, adopt, and begin implementation of a basin-wide strategy by July 1988.

55.     Congress supported this agreement by enacting the federal Water Quality Act of 1987 and authorizing $52 million in federal assistance for the Bay Program. Feb. 4, 1987, Pub.L. 100-4, Title I, § 103, 101 Stat. 10.

56.     The 1987 Agreement was amended in 1992 to, among other things; reaffirm the pollution reduction goal made in the 1987 Agreement. The Administrator of EPA signed the amendment on behalf of the United States.

57.     Another amendment to the 1987 Agreement was signed in 1992. The amendment reflected the critical importance of the tributaries in the ultimate restoration of the Chesapeake Bay. The signatories specifically stated that they would "[r]educe and control point and nonpoint sources of pollution to attain the water quality condition necessary to support the living resources of the Chesapeake Bay *and its tributaries*." (emphasis in the original).

58.     The parties also committed to develop and begin implementation of tributary-specific strategies by August 1993 to achieve the water quality requirements necessary to restore living resources in both the Bay mainstem and its tributaries.

59.     By the late 1990s, it was clear that the Bay jurisdictions would not attain the 40%

pollution reduction goal of the 1987 Bay Agreement and the 1992 amendment and the Bay

jurisdictions began development of a new Bay Agreement.

60.     On June 28, 2000, the Administrator of EPA, on behalf of the United States,

signed the Chesapeake Bay 2000 Agreement (the "2000 Agreement") with the Bay

Commission, Maryland, Pennsylvania, Virginia, and the District of Columbia.  In 2002,

Delaware, New York, and West Virginia became parties to the 2000 Bay Agreement.  The

2000 Agreement incorporated and reaffirmed the commitments made in 1983, 1987, and

1992 and outlined specific targets in five areas including the protection and restoration of the

Bay's living resources, vital habitat, and water quality.  The 40 percent nutrient reduction

goal was repeated.  In addition, the 2000 Agreement stated that the signatories would reduce

nitrogen, phosphorus, and sediment pollution to the Bay and its tidal tributaries sufficient to

remove the Bay from the Clean Water Act section 303(d) impaired waters list by 2010.

61.     The signatories to the 2000 Agreement, including the United States, committed to

attain, among others, the following goals:

a.      Restore, enhance and protect the finfish, shellfish and other living resources, their
        habitats and ecological relationships to sustain all fisheries and provide for a
        balanced ecosystem,

b.      Achieve and maintain the water quality necessary to support the aquatic living
        resources of the Bay and its tributaries and to protect human health, ….

62.     In the 2000 Agreement, as in the 1987 Bay Agreement, the United States

recognized that improving water quality was the "most critical element in the overall

protection and restoration of the Chesapeake Bay and its tributaries."  The United States

acknowledged that the Bay and numerous tributaries had been recently listed as impaired

pursuant to Section 303(d) of the CWA.  33 U.S.C. § 1313(d).  The United States committed

18

to improving water quality in the Bay and its tributaries "so that these waters may be removed from the impaired waters list prior to the time when regulatory mechanisms under Section 303(d) of the Clean Water Act would be applied."  The reference to "regulatory mechanisms" alluded to the federally enforceable consent decree against the United States that required the removal of these waters from the Section 303(d) list by 2010.  *American Canoe Ass'n v. United States*, 54 F.Supp. 2d 621 (E.D. Va. 1999).

63.     In 2000, Congress passed the Estuaries and Clean Water Act of 2000.  Pub. L. No. 457, 106th Cong., 114 Stat. 1967, 2000 U.S.C.C.A.N.  Title II of the Estuaries and Clean Water Act, known as the Chesapeake Bay Restoration Act of 2000, reauthorizes Section 117 of the Federal Water Pollution Control Act pertaining to the Chesapeake Bay. 33 U.S.C. § 1267.

64.     There, Congress made the following findings:

(1) the Chesapeake Bay is a national treasure and a resource of worldwide significance;

(2) over many years, the productivity and water quality of the Chesapeake Bay and its watershed were diminished by pollution, excessive sedimentation, shoreline erosion, the impacts of population growth and development in the Chesapeake Bay watershed, and other factors;

(3) the Federal Government (acting through the Administrator of the Environmental Protection Agency), the Governor of the State of Maryland, the Governor of the Commonwealth of Virginia, the Governor of the Commonwealth of Pennsylvania, the Chairperson of the Chesapeake Bay Commission, and the mayor of the District of Columbia, as Chesapeake Bay Agreement signatories, have committed to a comprehensive cooperative program to achieve improved water quality and improvements in the productivity of living resources of the Bay;

(4) the cooperative program described in paragraph (3) serves as a national and international model for the management of estuaries; and

(5) there is a need to expand Federal support for monitoring, management, and restoration activities in the Chesapeake Bay and the tributaries of the Bay in order to meet and further the original and subsequent goals and commitments of the Chesapeake Bay Program.

65.     In addition, Congress stated that the purposes of the Act were to "(1) expand and strengthen cooperative efforts to restore and protect the Chesapeake Bay, and; (2) to <u>achieve the goals established in the Chesapeake Bay Agreement</u>." *Id*. (emphasis added).

66.     Despite these findings and purposes, the water quality goal was missed for a third time.  As early as 2006, EPA announced that the goal of removing the Bay from the CWA § 303(d) list by 2010 would not be met.  2006-2011 EPA Strategic Plan, *Charting Our Course*, Sub-objective 4.3.4, pg. 98.  *See also*, Chesapeake Bay Commission Meeting, January 4, 2007; U.S. EPA Chesapeake Bay Program Report to Congress "Strengthening the Management, Coordination, and Accountability of the Chesapeake Bay Program," July 2008, Appendix D.

67.     In 2004, U.S. Senator Barbara Mikulski asked the EPA Office of the Inspector General (OIG) to evaluate the Agency's progress in meeting the nitrogen, phosphorus, and sediment pollution reduction goals of the 2000 Agreement.

68.     The OIG produced eight different reports addressing this issue.  Several OIG reports found that the Administrator and the United States had failed to implement programs and regulations essential for achieving the 2000 Agreement's water quality and natural resource goals.

69.     A 2006 OIG report found that EPA had failed to properly coordinate with the other partners in the 2000 Agreement to achieve nitrogen, phosphorous and sediment reductions. "Saving the Chesapeake Bay Watershed Requires Better Coordination of Environmental and Agricultural Resources," EPA Office of the Inspector General, Report No. 2007-P-00004 and US Department of Agriculture Report No. 50601-10-Hq, November 20, 2006.

70.     Other OIG reports found EPA had failed to properly address pollution from increased development, used outdated air pollution controls to address atmospheric deposition of nitrogen and failed to properly oversee wastewater treatment plant upgrades within the Bay Region. "Development Growth Outpacing Progress in Watershed Efforts to Restore the Chesapeake Bay," EPA Office of the Inspector General, Report No. 2007-P-00031, September 10, 2007; "EPA Relying on Existing Clean Air Act Regulations to Reduce Atmospheric Deposition to the Chesapeake Bay and its Watershed," Report No. 2007-P-00009, February 27, 2007; "Despite Progress, EPA Needs to Improve Oversight of Wastewater Upgrades in the Chesapeake Bay Watershed," EPA Office of the Inspector General, Report No. 08-P-0049, January 8, 2008.  The report concluded that without these efforts "Bay waters will continue to be impaired, adversely affecting living resources throughout the ecosystem that supports commercial and recreational uses."

71.     In addition to the OIG reports, the General Accountability Office (GAO), the investigative arm of the U.S. Congress, issued a report evaluating EPA's progress in meeting the nutrient and sediment goals of the 2000 Agreement. "Chesapeake Bay Program: Improved Strategies are Needed to Better Assess, Report and Manage Restoration Progress," GAO-06-96, July 12, 2006.  The report found that the United States had failed to implement programs and regulations essential for achieving the Agreement's water quality goals.

72.     Given EPA's inability to meet the Chesapeake 2000 Agreement mandates, it is clear why the Agreement's water quality goals were not met and Bay water quality was not restored by 2010.

The Chesapeake Bay Total Maximum Daily Load

73.     On December 29, 2010, EPA established the Chesapeake Bay Total Maximum

Daily Load with "rigorous accountability measures to initiate sweeping actions to restore

clean water in the Chesapeake Bay and the region's streams, creeks and rivers."

https://www.epa.gov/chesapeake-bay-tmdl, Executive Summary at i. *See* 76 Fed. Reg. 549

(Jan. 5, 2011). There, EPA stated:

> the TMDL will be implemented using an accountability framework that includes WIPs
> [Watershed Implementation Plans], two-year milestones, EPA's tracking and assessment
> of restoration progress and, as necessary, *specific federal contingency actions if the
> jurisdictions do not meet their commitments.* This accountability framework is being
> established in part to provide demonstration of the reasonable assurance provisions of the
> Chesapeake Bay TMDL pursuant to both the Clean Water Act (CWA) and the
> Chesapeake Bay Executive Order, but is not part of the TMDL itself.
> …
>
> *If a jurisdiction's plans are inadequate or its progress is insufficient, EPA is committed
> to take the appropriate contingency actions to ensure pollution reductions.* These include
> expanding coverage of NPDES permits to sources that are currently unregulated,
> increasing oversight of state-issued NPDES permits, requiring additional pollution
> reductions from point sources such as wastewater treatment plants, increasing federal
> enforcement and compliance in the watershed, prohibiting new or expanded pollution
> discharges, redirecting EPA grants, and revising water quality standards to better protect
> local and downstream waters.
>
> *Id.* at vii-viii (emphasis added).

74.     EPA identified the WIPs as the "cornerstone" of the Bay TMDL accountability

framework. Achieving basin-jurisdiction pollution allocations and meeting "EPA's

expectations for providing reasonable assurance that reductions will be achieved and

maintained" are the "two most important criteria for a WIP." *Id.* at viii.

75.     The Bay jurisdictions developed draft Phase I WIPs in conjunction with the

development of the Bay TMDL.  EPA provided comments to each of the states identifying

areas where their draft WIPs failed to provide reasonable assurance that the WIP would meet the state's respective TMDL target pollution reductions.

76.     The jurisdictions submitted final Phase I WIPs to the EPA on November 29, 2010. EPA found the Bay jurisdiction's Phase I WIPs failed to provide reasonable assurance that pollution controls identified could meet pollution reduction targets by 2017 (the midpoint assessment) or 2025 (the deadline for compliance).  *Id.*  Thus, EPA assigned "backstop allocations" in all seven jurisdictions "where EPA has federal authority to control pollution allocations through NPDES permits …." *Id.*  In the final TMDL, EPA took specific backstop actions in New York's Wastewater, Pennsylvania's Urban Stormwater, and West Virginia Agriculture sectors along with "enhanced oversite and contingencies." *Id* at ix – xi. These backstops re-allocated a jurisdiction's source specific pollution reductions identified in the Bay TMDL to another source sector or sectors.  EPA retained the authority to exercise similar re-allocations in the future if a jurisdiction was not meeting its TMDL obligations.

77.     While EPA believed the jurisdictions could meet their respective commitments, it was "prepared to take necessary actions in all jurisdictions for insufficient WIP implementation or pollution reductions."  *Id.* at xii.  EPA, as it had done in earlier correspondence and meetings with the Bay jurisdictions, identified eight different actions it could take including withholding grant funds, withdrawing point source permitting authority, and identifying backstop load allocations.  *Id.  See also,* Letter from Shawn Garvin to Preston Bryant, Chair of Principals' Staff Committee of the Chesapeake Executive Council, December 29, 2009; Letter from William Early to Preston Bryant, November 4, 2009.

78.     In the Final TMDL, EPA made clear that Phase III WIPs were to be designed to provide additional detail of restoration actions beyond the 2017 Phase II WIPs "and to ensure

that the 2025 goals are met." *Id.* The Bay TMDL specifically explained the Accountability Framework and "EPA actions designed to provide additional assurance that the Bay TMDL's allocations are achieved." *Id.* at 7-1. *See also,* Letter from Donald Welsh to John Griffin, September 11, 2008 (accountability framework established to implement reasonable assurance provisions of the Bay TMDL and pursuant to CWA Section 117(g)). EPA repeated its intention "to take additional federal actions, as determined to be appropriate to ensure implementation of the Bay TMDL, .…" *Id.* at 7-2. *See also, Id.* at 7-11 – 7-12.

79.     The Accountability Framework exists apart from the TMDL itself with a critical element being "EPA's commitment to take appropriate federal actions if the jurisdictions fail to develop sufficient WIPs, effectively implement their WIPs, or fulfill their 2-year milestones." *Id.* at 7-3. EPA specifically identified its expectations for each successive WIP: identify the controls needed to achieve allocations; identify the capacity to achieve the controls including funding; identify the gaps in current programs that must be filled with a commitment to work systematically to fill the gaps; a commitment to continued monitoring to assess effectiveness of implementation actions; and agreement that if a jurisdiction does "not meet the commitments, additional measures might be necessary." *Id.* at 7-5.

EPA's Evaluation of Phase I WIPs

80.     EPA identified flaws in each state's Phase I WIP and, in some situations, undertook "backstop" actions. For example, with respect to Pennsylvania's Phase I WIP, EPA transferred 50% of the urban stormwater load that was not then subject to National Pollution Discharge Elimination System permits from "load allocation" to "wasteload allocation." That is, EPA transferred half of the pounds of pollution to be reduced from the non-point source sector to the point source sector. EPA Summary of Pennsylvania WIP

Evaluation, December 29, 2010, p. 2.  EPA noted that it "may take additional actions …, as described in its December 29, 2009 letter, to ensure that nitrogen, phosphorous, and sediment reductions identified in the WIP and needed to meet the TMDL allocations are achieved."

81.    EPA took backstop actions against New York due to the numeric gap between New York's WIP and its modified allocations.  EPA Summary of New York WIP Evaluation, December 29, 2010, p. 2.  EPA made the same concluding statement as it did in the summary of its evaluation of Pennsylvania's Phase I WIP.  *Id*.

EPA's Evaluation of 2012-13 Milestones and Phase II WIPs

82.    After evaluating Pennsylvania's 2012-13 milestones and Phase II WIP, EPA maintained the backstop actions identified for the state's Phase I WIP concerning urban stormwater. This decision was made because the "WIP and milestones do not provide clear strategies for how the Commonwealth will achieve 40 to 50 percent reductions in nutrient and sediment pollution from existing urban lands." May 30, 2012 letter from Shawn Garvin, EPA Regional Administrator to Michael Krancer, Secretary of Pennsylvania Department of Environmental Protection, p. 2. EPA identified federal actions it was prepared to take if "key issues were not addressed."  *Id. See, Pennsylvania Phase II WIP and Milestone Evaluation*, May 30, 2012, p. 3.

83.    While EPA removed the wastewater backstop allocation from New York in its Phase II WIP, the Agency stated that, as with all of the Bay jurisdictions, EPA would "continue to hold New York accountable for implementing controls and practices by 2017 that would achieve 60 percent of the necessary nutrient and sediment load reductions needed to achieve water quality standards."  February 12, 2013 letter from Jeff Corbin, Senior Advisor to the Administrator for the Chesapeake Bay and Anacostia River, to New York

Commissioner Martens, p. 1. "EPA will maintain oversight of WIP and milestone implementation for all Bay jurisdictions and reserves its authority to use the full suite of federal actions available under the Clean Water Act and applicable regulations, as detailed in EPA's December 29, 2009 letter, to ensure that WIPs are implemented and pollution reductions achieved." *Id.*

84.    In its evaluation of New York's Phase II WIP, EPA stated that it fully expected New York's Phase III WIP and/or future two-year milestones would incorporate NPDES permit changes for the wastewater sector to meet WIP pollution reduction targets by 2025. *EPA's New York Final Phase II WIP and Milestone Evaluation,* February 21, 2013.  New York was directed to explain how it would achieve its 2025 pollution reductions for nitrogen, phosphorus, and sediment in its upcoming milestones through 2017.  *Id.* p. 2-3.

Development of the Phase III WIPs

85.    Despite its prior oversight, admonitions and backstop actions, EPA approved Phase III WIPs from Pennsylvania and New York, that – by EPA's own admission - do not provide reasonable assurance that the states' 2025 commitments will be met.

86.    In June of 2018, EPA provided the Bay jurisdictions with its expectations for the forthcoming Phase III WIPs. *U.S. Environmental Protection Agency's Expectations for the Phase III Watershed Implementation Plans*, EPA 1 (June 20, 2018), https://www. chesapeakebay.net/documents/EPA_Phase_III_WIP_Expectations.pdf.  In setting its expectations for Pennsylvania, EPA directed that Pennsylvania needs to reduce its nitrogen pollution loadings by 35 million pounds between 2018 and 2025 in order to meet the TMDL water quality goals. *Id.* at 14.  EPA expressly directed Pennsylvania to include technical details on BMP (Best Management Practices) implementation for nonpoint sources,

particularly in the agriculture and stormwater sector, to demonstrate that the Commonwealth would meet its Phase III WIP obligations. *Id.* at 14.  EPA also stated that Pennsylvania should commit to programmatic, policy, legislative, and regulatory changes, in addition to adequate staffing and financial resources to implement the Phase III WIP and meet the TMDL requirements.  *Id.* at 16.  EPA indicated that it would enhance oversight over Pennsylvania's WIP efforts, requiring Pennsylvania to report on its progress every six months and directing federal funds to be spent in priority watersheds. *Id.* at 17.

87.     In June of 2019, EPA evaluated the Bay jurisdiction's draft Phase III WIPs.  EPA concluded that Pennsylvania's draft WIP only achieved 64% of the nitrogen reduction targets and 76% of the phosphorus reduction targets. *Evaluation of Pennsylvania's Draft Phase III Watershed Implementation Plan*, EPA, https://www. epa.gov/sites/production/files/2019_06/documents/epa_evaluation_pennsylvania_draft_phase _iii_wip.pdf.  EPA concluded that New York's WIP would only achieve 61% of the nitrogen reduction targets. *Evaluation of New York Draft Phase III Watershed Implementation Plan*, EPA 3 (2019), https://www.dec.ny.gov/docs/water_pdf/epaevalwipiii.pdf.

88.     Instead of implementing backstop measures at the draft WIP stage, EPA departed from its past practice and only recommended "potential enhancements" for Pennsylvania and New York to include in their final Phase III WIPs.

89.     In August of 2019, the Bay jurisdictions submitted their final Phase III WIPs. Both Pennsylvania and New York's final WIPs remained significantly deficient and fell short of EPA's and the co-member states' expectations. Pennsylvania's Phase III WIP would only meet 75% of its nitrogen reduction requirements by 2025.  Moreover, Pennsylvania's WIP had a funding shortfall of over $300 million a year for the next five years.  New York's

Phase III WIP identified a one-million-pound shortfall in nitrogen reduction, meeting only 66% of the state's nitrogen TMDL reduction requirements.

90.     Despite the significant shortfalls in both Pennsylvania and New York's Phase III WIPs, EPA approved both WIPs on December 19, 2019. *Evaluation of Pennsylvania's Phase III Watershed Implementation Plan (WIP)*, EPA 4; *Evaluation of New York's Phase III Watershed Implementation Plan (WIP)*, EPA 4.  EPA did not utilize its authority under the Clean Water Act as stated in the Bay TMDL and its November 4, 2009 and December 29, 2009 letters, *see* paragraph 77, to assert backstop measures or consequences against Pennsylvania or New York for their facially deficient Phase III Watershed Implementation Plans.

91.     By approving these WIPs without changes sufficient to meet the Bay Agreement water quality goals by 2025 and without TMDL "backstop measures", EPA has failed to comply with the agreed upon TMDL Accountability Framework and the Clean Water Act. With the WIP process complete, there are no further statutory or regulatory mechanisms to ensure that the Bay jurisdictions will achieve and maintain the nutrient reduction requirements of the Chesapeake Bay TMDL.

92.     Pennsylvania has been consistently behind in achieving its nutrient and sediment reduction goals.  EPA noted in its assessment of Pennsylvania's 2012-13 and 2014-15 Milestone attainment that Pennsylvania had failed to achieve its milestone goals and would "need to place additional emphasis on improving implementation in the agriculture and stormwater sectors and the offsets and trading program to stay on track to meet its Watershed Implementation Plan (WIP) and Chesapeake Bay Total Maximum Daily Load (Bay TMDL) commitments by 2025."  EPA Evaluation of Pennsylvania's 2012-2013 and 2014-2015

Milestones, June 26, 2014, available at https://www.epa.gov/sites/production/files/2015-06/documents/pa.pdf.

93.     EPA observed that Pennsylvania is responsible for 46% of the nitrogen, 26% of the phosphorus and 31% of the sediment load entering the Chesapeake Bay, so it is critical that Pennsylvania's load reductions remain on track. *Id.* at 1.

94.     In its 2018 Midpoint Assessment, EPA identified Pennsylvania as the only jurisdiction that had shown a significant inability to meet its pollutant reduction goals for both the agriculture and urban stormwater sectors.  Consistent with its role in the Accountability Framework and under the CWA, EPA imposed "backstop" measures against Pennsylvania, transferring pollution loads from one sector to another.

95.     These measures have also proven ineffectual as Pennsylvania has again failed to meet its milestone goals in EPA's most recent evaluation of the Commonwealth's 2018-2019 and 2020-2021 milestones: "According to the data provided by Pennsylvania for the 2019 progress run, Pennsylvania did not achieve its statewide and state-basin 2019 targets for nitrogen, phosphorus, and sediment." *EPA Evaluation of Pennsylvania's 2018-2019 and 2020-2021 milestones*, July 29, 2020.  EPA noted that Pennsylvania has a 9.8 million pound nitrogen gap and failed to identify funding sources necessary to meet its WIP III obligations. *Id*.  These shortfalls continue in the agriculture and stormwater sectors.

96.     Because EPA has not taken backstop actions to correct for the deficiencies in the Pennsylvania and New York WIP IIIs, the Bay TMDL water quality goals will not be met by the 2025 deadline.  This will be EPA's third failed effort to restore Bay water quality and to meet the requirements of the Chesapeake Bay Agreement and section 117(g) of the Clean Water Act.

97.     In fact, Pennsylvania's water pollution problem is getting worse, not better.  The most recent assessment of the water quality of Pennsylvania's rivers and streams shows more than 25,800 miles of impaired waterways—5,500 more miles than were measured in 2016.

98.     The failures of the United States to comply with the terms of the Chesapeake Bay Agreements and the CWA identified above, among other things, have led to the continued degradation of water quality in the Chesapeake Bay and its tributaries and will ensure that the Bay TMDL and Chesapeake Bay Agreement goals are not met, all to the detriment of Plaintiffs' aesthetic, cultural, educational, economic, recreational, and restoration interests.

## CLAIMS

### Count I: The Defendants Have Failed to Comply With the Clean Water Act

99.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 98 above.

100.    Section 303 of the CWA requires that state water quality standards be met and that TMDLs be developed to attain those standards. 33 U.S.C. § 1213.  The District of Columbia, Delaware, Maryland and Virginia have all set water quality standards for their respective waters that are tidally influenced by the Chesapeake Bay.  Maryland and Virginia have also set water quality standards for their respective portions for the Bay.  The Bay TMDL is designed to meet these water quality standards.  The 2014 Chesapeake Bay Agreement incorporates this goal.

101.    Section 117(g)(1) of the CWA requires the Administrator of EPA to take specific steps to achieve the nutrient goals of the 2014 Chesapeake Bay Agreement.  Section 117 provides (33 U.S.C. § 1267(g)(1)(A)-(E)):

> **(g) Chesapeake Bay Program**
> **(1) Management strategies**

The Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain –

(A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed.

(B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem;

(C) the Chesapeake Bay Basinwide Toxins Reduction and Prevention Strategy goal of reducing or eliminating the input of chemical contaminants from all controllable sources to levels that result in no toxic or bioaccumulative impact on the living resources of the Chesapeake Bay ecosystem or on human health;

(D) habitat restoration, protection, creation, and enhancement goals established by Chesapeake Bay Agreement signatories for wetlands, riparian forests, and other types of habitat associated with the Chesapeake Bay ecosystem; and

(E) the restoration, protection, creation, and enhancement goals established by the Chesapeake Bay Agreement signatories for living resources associated with the Chesapeake Bay ecosystem.

102.	Section 117 was re-authorized as part of the Estuaries and Clean Water Act of 2000, Title II Chesapeake Bay Restoration.  One of the explicit purposes of the Restoration title was "to achieve the goals established in the Chesapeake Bay Agreement."  106 Pub.L. 457, Title II, Sec. 202(b)(2), Nov. 7, 2000, 114 Stat. 1967.

103.	The duties of the Administrator are non-discretionary and subject to enforcement via the citizen suit provisions of the CWA.  33 U.S.C. § 1365.

104.	Section 117(g)(1)(A) requires the Administrator in coordination with the states to ensure that management plans are developed and implementation has begun to "achieve and maintain … the nutrient goals" of the Chesapeake Bay Agreement "for the quantity of nutrient and phosphorus entering the Chesapeake Bay and its watershed." 33 U.S.C. § 1267(g)(1)(A).

105.    Section 117(g)(1)(B) requires the Administrator, in coordination with the states, to ensure that management plans are developed and implementation is begun to "achieve and maintain … the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem."

106.    The 1987 Bay Agreement set a goal for reducing nutrient pollution by 40 percent by the year 2000.  That goal was reaffirmed in the 1992 amendment.  It was not met by the 2000 deadline.

107.    EPA admitted that it could not attain the 2000 Agreement water quality goals of 40 percent nutrient reduction or removing the Bay from the impaired waters list by 2010, so it worked with the Bay jurisdictions to develop the Chesapeake Bay TMDL.

108.    EPA signed the 2014 Chesapeake Bay Agreement on behalf of the United States. Each of the Bay jurisdictions also signed the Agreement.

109.    The 2014 Chesapeake Bay Agreement contains a Water Quality standard which provides in part:

> The Chesapeake Bay Total Maximum Daily Load (TMDL) is driving nutrient and sediment reductions as described in the Watershed Implementation Plans (WIPs), adopted by the states and the District of Columbia, and establishes the foundation for water quality improvements embodied in this Agreement. These plans set nutrient and sediment reduction targets for various sources—stormwater, agriculture, air deposition, wastewater and septic systems.

110.    The 2014 Chesapeake Bay Agreement Water Quality Goal provides:

> "Reduce pollutants to achieve the water quality necessary to support the aquatic living resources of the Bay and its tributaries and protect human health."

**Outcomes**

| 2017 Watershed Implementation | → | By 2017, have practices and controls in place that are expected to achieve 60 percent of the nutrient |
| --- | --- | --- |

| Plans (WIP) Outcome | | and sediment pollution load reductions necessary to achieve applicable water quality standards compared to 2009 levels. |
|---|---|---|
| 2025 WIP Outcome | → | By 2025, have all practices and controls installed to achieve the Bay's dissolved oxygen, water clarity/submerged aquatic vegetation and chlorophyll a standards as articulated in the Chesapeake Bay TMDL document. |

….

111.    This goal and these outcomes identify "the nutrient goals" "for the quantity of nitrogen and phosphorus pollution entering the Chesapeake Bay and its watershed" to which Section 117(g)(1)(A) and (B) refer and therefore are the goals Section 117 requires the Administrator to achieve.

112.    This goal and these outcomes which address nutrient-reduction, are enforceable because these goals were created "[i]n order to achieve" the longstanding goal of removing the Bay from the impaired waters list.

113.    The Outcomes related to the Goal "are the specific, time-bound, measurable targets that directly contribute to achievement of the Goals."  Governance and Management Framework for the Chesapeake Bay Program Partnership, pg. 19.

114.    Congress stated that the purpose of section 117 was "to expand and strengthen cooperative efforts to restore and protect the Chesapeake Bay; and to achieve the goals established in the Chesapeake Bay Agreement" not merely develop plans and begin their implementation.  106 Pub.L. 457, Estuaries and Clean Waters Act of 2000, Title II, Sec. 202(b)(2), Nov. 7, 2000, 114 Stat. 1967.  However, the Administrator has failed to comply with these directives.  Accordingly, the Administrator is subject to suit pursuant to Section 505(a)(2) of the CWA.  33 U.S.C. § 1365(a)(2).

115.    By approving Pennsylvania's and New York's facially deficient WIPs without taking backstop measures or imposing consequences on the states, the Administrator, the Regional Administrator, and the United States failed to comply with the duties set forth in Section 117(g) of the CWA and the Chesapeake Bay Agreements to the detriment of the Plaintiffs and their respective members' and residents' aesthetic, cultural, educational, economic, recreational, and restoration interests.

**Count II: The Defendants Have Violated the Administrative Procedure Act**

116.    The Plaintiffs reallege and incorporate by reference paragraphs 1-115.

117.    The Administrative Procedure Act allows citizens to challenge federal agency decisions that are arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.  5 U.S.C. § 706(2)(A).

118.    The decision to approve a WIP that does not timely achieve the required nutrient reductions, and cannot fully be implemented because of inadequate funding, is arbitrary and capricious.  In approving the Pennsylvania and New York Phase III WIPs without taking backstop measures or exacting consequences, EPA failed to consider an important aspect of the problem and offered an explanation that runs completely counter to the evidence before it.  The Defendants have a duty to ensure states develop plans that achieve the requirements of the TMDL.  Instead, the Defendants rubber-stamped Pennsylvania's and New York's inadequate Plans, ignoring ample evidence from the states and commenters, as well as its own staff, that the Plan would not achieve the required nutrient reductions.  As the Third Circuit held, "it would surely be arbitrary or capricious for the EPA to approve a plan that a state is incapable of following." *Am. Farm Bureau Fed'n v. EPA,* 792 F.3d 291, 307 (3rd Cir. 2015).

119. EPA's approval of Pennsylvania's and New York's final Phase III WIPs constituted final agency actions within the meaning of the Administrative Procedure Act.

120. The Defendants' failure to undertake actions sufficient to meet the water quality, living resource, vital habitat, and chemical contaminant goals of the Chesapeake Bay Agreements was arbitrary and capricious.

121. Federal agency action and inaction which violate the terms of the Chesapeake Bay Agreements are "not otherwise in accordance with the law" and are *per se* arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

122. The Defendants' arbitrary and capricious approval of the Phase III WIPs has harmed the Plaintiffs' and their respective members' and residents' aesthetic, cultural, educational, economic, recreational, and restoration interests.

123. Because the Defendants have unreasonably failed to timely comply with the Chesapeake Bay Agreements and have acted arbitrarily and capriciously, they have violated the Administrative Procedure Act.  Thus, the United States is subject to suit.  5 U.S.C. §§ 701, 702.

## RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. Declare that the Defendants failed to ensure that Pennsylvania and New York's Phase III WIPs were developed and implemented to achieve and maintain the nutrient reduction goals in the Bay TMDL in violation of 33 U.S.C. § 1267(g)(1)(A).

2. Declare that the Defendants failed to ensure that Pennsylvania and New York's Phase III WIPs were developed and implemented to achieve and maintain the water quality requirements

necessary to restore living resources in the Chesapeake Bay ecosystem in violation of 33 U.S.C. § 1267(g)(1)(B).

3.    Declare that the Defendants failed to perform their nondiscretionary duty under 33 U.S.C. §1267(g)(1)(A) to ensure that Pennsylvania and New York developed and implemented Phase III WIPs that achieve and maintain the nutrient reduction goals in the Bay TMDL and the 2014 Chesapeake Bay Agreement.

4.    Declare that the Defendants failed to perform their nondiscretionary duty under 33 U.S.C. §1267(g)(1)(B) to ensure that Pennsylvania and New York developed and implemented Phase III WIPs that achieve and maintain the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem.

5.    Declare that the Defendants' approval of the facially deficient Pennsylvania and New York Phase III WIPs was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

6.    Vacate and set aside the Defendants' approval of Pennsylvania's and New York's Phase III WIPs.

7.    Order the Defendants to take appropriate actions to ensure that Pennsylvania's and New York's Phase III WIPs will achieve and maintain the nutrient reduction and water quality goals of the Chesapeake Bay Agreement and the Bay TMDL by 2025.

8.    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

9.    Grant such additional and further relief as the Court may deem just, proper, and necessary.

Date: September 10, 2020

       /s/ Jon Mueller
Jon A. Mueller – DC Bar No. 981443
Paul Smail – DC Federal Bar No. MD0061
Brittany Wright – MD Bar No. 1612140074
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(443) 482-2162
jmueller@cbf.org

*Counsel for*
*Chesapeake Bay Foundation, Inc.*
*Maryland Watermen's Association*
*Jeanne Hoffman*
*Robert Whitescarver*


*Hamilton F. Tyler*
Hamilton F. Tyler
D.C. Federal Bar No. 433122
Deputy County Attorney
Anne Arundel County Office of Law
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
(410) 222-7888
htyler@aacounty.org

*Attorney for Plaintiff Anne Arundel County,*
*Maryland*