IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHESAPEAKE BAY FOUNDATION, *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY, *et al.*<br><br>      Defendants. | 1:20-cv-2529  (CJN) |

| | |
|---|---|
| STATE OF MARYLAND, *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>ANDREW R. WHEELER, *et al.*<br><br>      Defendants. | 1:20-cv-2530  (CJN) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

The Chesapeake Bay (or "Bay") is an exceptional natural resource that occupies a unique space in national clean water policy. Since 1983, the states in the Chesapeake Bay watershed and the federal government have, through a series of interstate compacts known as the Chesapeake Bay Agreements, joined together to study, plan, and implement pollutant-reduction measures to restore the Bay. Together, these states and EPA form the "Bay Partnership." In service of that partnership, the Clean Water Act ("CWA") directs EPA, "in coordination with other members of

the Chesapeake Executive Council,"[1] to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain" the goals of the Bay restoration program. 33 U.S.C. § 1267(g).

Unhappy with Pennsylvania and New York's progress in meeting the Bay Partnership's water quality goals, Plaintiffs in each of the above-captioned cases point the finger at EPA. Specifically, Plaintiffs allege that EPA's recent evaluation of New York and Pennsylvania's Chesapeake Bay pollutant-reduction plans, called Watershed Implementation Plans ("WIPs"), did not take action to correct the plans or otherwise to achieve the needed pollutant reductions. *See* Chesapeake Bay Foundation *et al.* ("CBF") Compl. ¶¶ 32, 96; State of Maryland *et al.* ("States") Compl. ¶¶ 49, 52. Plaintiffs contend that EPA's failure to take those actions constituted EPA's de facto "approval" of the deficient plans, which they allege violates the CWA and the Administrative Procedure Act ("APA"). States Compl. ¶¶ 53, 85–90, 91–96; *accord* CBF Compl. ¶¶ 119, 99–115, 116–23.

Plaintiffs' claims fail for lack of jurisdiction and for failure to state a claim. First, Plaintiffs' claim that CWA section 117(g) imposes a nondiscretionary duty "to require Pennsylvania and New York to develop and implement Phase III WIPs that meet the goals of the Bay Agreement," States Compl. ¶ 90; *accord* CBF Compl. ¶ 115, does not meet the two prerequisites for a nondiscretionary duty actionable under the CWA's citizen suit provision: (1) section 117(g) does not impose a date-certain deadline for taking the alleged nondiscretionary action; and (2) the alleged duty is not a discrete, mandamus-like duty about which EPA has no discretion. Absent a nondiscretionary duty, the CWA citizen-suit provision's waiver of sovereign

[1] The Chesapeake Executive Council consists of the signatories of the Chesapeake Bay Agreement. 33 U.S.C. § 1267(a)(5).

immunity does not apply and the Court lacks jurisdiction over that claim. Second, with respect to Plaintiffs' APA claims, EPA's evaluations of New York and Pennsylvania's Phase III WIPs—which provided the agency's assessment of the states' plans and suggestions for how they could address shortcomings—are not final agency actions subject to judicial review. EPA's evaluation of the states' planning documents are informational only, not intended in purpose or effect to be final agency actions; EPA has no authority or obligation to "approve" the states' WIPs under the Clean Water Act.

For these reasons, as explained further below, the Court should dismiss the complaints.[2]

## I.     BACKGROUND

### A.  Legal Background

#### 1.  The Clean Water Act

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective" to restore and maintain the Nation's waters. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). To assure water quality protection, the CWA identifies a number of specific requirements for EPA to perform, as well as other discretionary tools including awarding and conditioning federal grants to the states and entering into geographic federal-state partnerships such as the Chesapeake Bay Agreement.

---

[2] Because EPA contends there are jurisdictional and other deficiencies on the face of the complaints that warrant dismissal, including the absence of a "final agency action" judicially reviewable under the Administrative Procedure Act, it has moved for the Court to suspend the requirement that it file the certified index to the administrative record concurrently with this dispositive motion. *See* Local Rule 7(n)(1); *see* EPA Motion to Suspend Deadline to File Certified Index to Administrative Record (1-20-cv-2529 Dkt. 15), (1-20-cv-2520 Dkt. 17).

CWA section 303, 33 U.S.C. § 1313, embodies the "shared authority" approach. First, the CWA requires each state to adopt water quality standards to protect the public health and welfare, enhance water quality, and otherwise serve the purposes of the CWA. 33 U.S.C. § 1313(a)–(c); *see Friends of the Earth v. EPA*, 333 F.3d 184, 186 (D.C. Cir. 2003). Water quality standards, which amount to a description of the desired condition of a waterway, set out "designated uses" for the waters, water quality criteria, and antidegradation requirements. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. Part 131. States must review and, as appropriate, modify or adopt new water quality standards at least every three years. 33 U.S.C. § 1313(c)(1). EPA must review and either approve or disapprove state-adopted new or revised water quality standards. *Id.* § 1313(c)(3). If a state does not set water quality standards—or if EPA determines that a state's standards do not meet the requirements of the Act—EPA promulgates the water quality standards for the state. *Id.* § 1313(b), (c)(3)–(4).

The CWA also requires states to identify certain waterbodies impaired by pollutants that are not meeting applicable water quality standards. *Id.* § 1313(d)(1)(A). As with water quality standards, EPA must either approve a state's list of impaired waters or, if it disapproves, establish a list of impaired waters for the state. *Id.* § 1313(d)(2). States are generally required to establish a "total maximum daily load" or "TMDL" for the waters for which the state listed as impaired. *Id.* § 1313(d)(1)(C). A TMDL identifies the maximum amount of a pollutant that can be added to a waterbody from all sources and still attain applicable water quality standards. *Id.*; 40 C.F.R. § 130.7(c)(1). As with water quality standards and impaired waters lists, EPA must either approve a state's TMDL or, if it disapproves, establish a TMDL for that impaired waterbody. 33 U.S.C. § 1313(d)(2).

TMDLs themselves have no self-executing regulatory force. *Anacostia Riverkeeper, Inc. v. Wheeler*, 404 F. Supp. 3d 160, 165 (D.D.C. 2019). Instead, a TMDL is an "informational tool[] that allow[s] the states to proceed from the identification of waters requiring additional planning to the required plans." *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002); *accord Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 216 (D.D.C. 2011). States can develop implementation plans that identify how pollutant sources or categories of sources can collectively reduce pollutant discharges to meet the TMDL, but the CWA does not require them to do so. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 984 F. Supp. 2d 289, 297–98 (M.D. Pa. 2013), *aff'd*, 792 F.3d 281 (3d Cir. 2015) ("[Mechanisms to implement a TMDL] are available under other provisions of the CWA, as well as the Clean Air Act, state laws, federal and state regulations, and local ordinances."). A TMDL, at its heart, simply helps states identify where pollution-reduction measures are needed within the context of a larger plan—a function that is particularly helpful for large and complex watersheds. In 2010, EPA, at the request with the agreement of the Bay states, issued a TMDL establishing maximum loads of nitrogen, phosphorus, and sediment for certain Chesapeake Bay waterways. *See supra* Part I.A.2.c.

## 2. Chesapeake Bay's Unique Legal Framework

### a. The Bay Agreements and CWA Section 117

The Chesapeake Bay (or "Bay") is an exceptional natural resource that occupies a unique space in national clean water policy. Since 1983, the states in the Chesapeake Bay watershed and the federal government have, through a series of interstate compacts known as the Chesapeake Bay Agreements and a structure known as the Chesapeake Bay Program partnership, joined together to study, plan, and implement pollutant reduction measures to restore the Bay. States Compl. ¶ 24; CBF Compl. ¶¶ 52-53. The most recent compact is the 2014 Chesapeake Bay

Watershed Agreement,[3] signed by the seven Chesapeake Bay states (Virginia, Maryland, Delaware, West Virginia, Pennsylvania, New York, and the District of Columbia[4]), the Chesapeake Bay Commission,[5] and EPA on behalf of the federal government. *See* Chesapeake Bay Watershed Agreement (Ex. A) at 3.

The 2014 Bay Agreement states the parties' goal to "[r]educe pollutants to achieve the water quality necessary to support the aquatic living resources of the Bay and its tributaries and protect human health." *Id*. at 9. Specifically, the Agreement states the parties' goal to, "[b]y 2025, have all practices and controls installed to achieve the Bay's dissolved oxygen, water clarity/submerged aquatic vegetation and chlorophyll *a* standards as articulated in the Chesapeake Bay TMDL document." *Id*. at 7.

Congress first ratified the Chesapeake Bay Program in the Water Quality Act of 1987. CBF Compl. ¶ 55 (citing Pub. L. No. 100-4, § 103, 101 Stat. 10 (1987) (codified at 33 U.S.C. § 1267)); *see also* States Compl. ¶ 25. That Act added section 117 to the CWA, authorizing and

---

[3] Because the 2014 Chesapeake Bay Watershed Agreement is referred to in Plaintiffs' complaints and is central to their claims, the Court may consider it as part of a motion to dismiss. States Compl. ¶ 28; CBF Compl. ¶ 5; *see Marshall v. Honeywell Technology Solutions, Inc*., 536 F. Supp. 2d 59, 65 (D.D.C. 2008) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion [to dismiss] to one for summary judgment." (internal quotation and citation omitted)). For the same reason, the Court may consider the Chesapeake Bay TMDL, *see, e.g.*, States Compl. ¶¶ 29–32; CBF Compl. ¶ 73, and EPA's evaluations of Pennsylvania's and New York's Phase III WIPs, *see* CBF Compl. ¶ 90

[4] The District of Columbia is considered a "state" for purposes of the Clean Water Act. 33 U.S.C. § 1362(3).

[5] The Chesapeake Bay Commission is a tri-state legislative body formed in the early 1980s by the states of Maryland, Pennsylvania, and Virginia to coordinate interstate programs to protect the Chesapeake Bay. Chesapeake Bay Foundation *et al*. ("CBF") Compl. ¶ 48. The Commission comprises, from each state: five legislators, three citizens, and one natural resource cabinet secretary. *Id*. ¶ 49.

funding the EPA's Chesapeake Bay Program Office and providing grants to facilitate Bay states' pollutant-reduction measures. *See* Pub. L. No. 100-4, § 103, 101 Stat. 10 (1987) (codified at 33 U.S.C. § 1267). Under section 117, EPA coordinates with the Bay states and offers technical support for the Bay partnership's monitoring, analysis and restoration goals.

In November 2000, Congress further amended the CWA to add subsection 117(g), which directs EPA, "in coordination with other members of the Chesapeake Executive Council," to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain," among other things, "the nutrient goals of the Chesapeake Bay Agreement." 33 U.S.C. § 1267(g). As evidenced in the amendment's legislative history, Congress intended EPA to use the grants previously authorized under section 117 to implement its new subsection (g) responsibilities. H. Rep. 106-550, House Report of the House Committee on Transportation and Infrastructure on the Chesapeake Bay Restoration Act of 1999 (Mar. 29, 2000) ("The Committee expects EPA to meet the requirements of [paragraph (g)] through the award of implementation grants under subsection (e).").

### b.  The Bay Partnership's Accountability Framework

As outlined above, EPA has been working collaboratively with the Bay states and the broader Bay Program for decades to restore the Chesapeake Bay. In the late 2000s, in collaboration with the Bay Agreement states, EPA developed an "accountability framework" to guide the group's collective restoration efforts. This framework is a mechanism for Bay partnership members to provide accountability to EPA, each other, and the public for meeting the goals of the Bay Agreement. *See* Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment ("Bay TMDL") at 7-1 (Dec. 29, 2010) (Ex. B). The accountability framework has four elements: state WIPs, state and federal two-year milestones to demonstrate

7

restoration progress, EPA's tracking and assessment of restoration progress, and the potential for specific federal actions if states do not meet their commitments. Bay TMDL at 7-5. Under the framework, the Bay states agreed to a target date of 2025 to have all necessary pollutant-control measures in place to meet the Bay's water quality standards, as well as interim "mid-point assessments" to assess progress. *See* Bay TMDL at 1-9.

WIPs are essentially a roadmap for how each Bay state will achieve the needed pollutant reductions to meet water quality standards. *Id.* at 7-6. The states' WIPs identify a schedule for accomplishing nutrient and sediment load reductions and identify programs and actions to achieve these reductions, such as adopting new regulatory authorities, improving compliance with existing regulations, securing additional resources for cost-share programs, and issuing pollutant-discharge permits with more stringent effluent limits. *See id.* The Bay states were to develop WIPs in three phases, with each phase refinining the actions and controls implemented to achieve applicable water quality standards. *Id.* at 7-7. EPA considers WIPs as planning tools that are not themselves enforceable, at least under federal law.

As part of EPA's role in the accountability framework, EPA reviews and evaluates each state's WIP to determine whether it sets out sufficient commitments to meet the Agreement's 2025 goals and whether there is an adequate level of confidence that the state will achieve those commitments. EPA provides each state (as well as the public) with an assessment of the WIP, but EPA does not approve or disapprove the WIP. *See* Bay TMDL, 1-15, 1-16 (1.4.1), 7-5 (7.2). EPA's evaluations are not required by statute or regulation.

Similar to WIPs, under the accountability framework each state develops two-year milestones to explain how it intends to implement its WIP over a specific two-year period. And

as it does with WIPs, EPA reviews and evaluates the two-year milestones and provides an assessment, but does not approve or disapprove the two-year milestones.

The accountability framework also envisions that EPA may take certain discretionary "federal actions" if EPA determines that a state's WIP does not achieve the Bay Partnership's goals or does not provide sufficient confidence that the state will be able to achieve those goals. EPA has identified a number of potential federal actions—sometimes called "backstops"—that it may, in its discretion, take. *See, e.g.*, Bay TMDL at 7-2, 7-11–7-12. Since 2010, EPA has exercised that discretion to take many federal actions including objecting to NPDES permits; providing technical assistance to the states; and conditioning, withholding and/or redirecting grant funds to address weaknesses in a state's implementation of its WIP or milestones.

### c. The Bay TMDL

In 2010, EPA established the Bay TMDL, which set the maximum amount or loads of nitrogen, phosphorus, and sediment that the 92 segments of the tidal Bay can assimilate and still meet the applicable water quality standards. *See generally* Bay TMDL at 1-4. The TMDL discusses the Partnership's target dates, including an interim mid-point assessment that 60% of states' proposed actions were expected to be complete by 2017, with all pollutant-control measures in place by 2025. States Compl. ¶¶ 31–32; CBF Compl. ¶¶ 3, 5.

When EPA establishes or approves a TMDL, it determines, in certain circumstances, whether there is "reasonable assurance" that the relevant water quality standards will be achieved. 33 U.S.C. § 1313(d); *see* Bay TMDL at 7-1; *see also American Farm Bureau*, 792 F.3d at 300–01. For the Bay TMDL's reasonable assurance determination, EPA relied in large part on the Bay Partnership's "accountability framework" and the states' commitment to

implement the TMDL's allocations through the three phases of WIPs envisioned under that framework. *See* Bay TMDL at 7-1 & Section 8.

### B.  Procedural Background

#### 1.  Submission of Phase III WIPs

In 2019, the Bay states—including Pennsylvania and New York—submitted their Phase III WIPs to EPA. *See* States Compl. ¶ 49; CBF Compl. ¶ 89.

In December 2019, EPA issued its evaluations of Pennsylvania and New York's Phase III WIPs. *See* CBF Compl. ¶ 90 (citing EPA Eval. of PA Phase III WIP, (Ex. C) & EPA Eval. of NY Phase III WIP, (Ex. D) [hereinafter, jointly referred to as the "EPA Evaluations"]). The evaluations noted that "EPA does not approve or disapprove a WIP, EPA provides the [WIP] assessment for the benefit of the [Chesapeake Bay Program] jurisdictions, and, as appropriate, may provide additional recommendations for strengthening the WIP or its components." *See* EPA Evaluations.

In its Evaluations, EPA found that the respective Phase III WIPs met expectations in some areas and fell short in others. *See* EPA Evaluations. To remedy the deficiencies, EPA's evaluations recommended enhancements that the states could undertake to ensure their pollutant-reduction goals would be reached. *See* EPA Evaluations.

#### 2.  Phase III WIP Revisions

After receiving EPA's evaluation of their final Phase III WIPs, both New York and Pennsylvania have signaled their intention to revise their Phase III WIPs to meet the Bay Agreement's 2025 pollutant-reduction goals. In its 2020–2021 two-year milestone report, Pennsylvania committed to complete the "County Action Plans" ("CAPs") necessary to meet its pollutant-reduction commitments and to amend its Phase III WIP by December 2021. *See* EPA

Evaluation of PA 2018–2019 and 2020–2021 Milestones (Dec. 19, 2019) (Ex. E); *see* PA Phase III WIP at 14 (Ex. F). EPA found that this commitment would strengthen Pennsylvania's ability to meet the 2025 targets. *Id.*

New York provided EPA with a draft of an amended Phase III WIP in October 2020, and has since revised that draft. *See* NY Amended Phase III WIP (Nov. 2020) (Ex. G); *see also* Decl. of Lauren A. Townley at ¶ 8 (Dkt. 15-1).[6] New York represents that its "amended Phase III WIP fully meets the 2025 targets for nitrogen, phosphorus, and sediment as agreed upon by the Chesapeake Bay Program Partnership." *Id.* at 6. EPA is currently evaluating New York's draft, amended Phase III WIP. *See* EPA, Key Developments in the Chesapeake Bay Watershed, *available at* https://www.epa.gov/chesapeake-bay-tmdl/key-developments-chesapeake-bay-watershed.

### 3. Plaintiffs' Lawsuits

On September 9, 2020, Maryland, Virginia, Delaware, and the District of Columbia (State Plaintiffs) filed this action challenging EPA's handling of Pennsylvania and New York's Phase III WIPs. *See generally* States Compl. State Plaintiffs claim EPA, its Administrator, and EPA Region 3's Regional Administrator and its administrators failed to abide by their statutory obligations under the CWA, 33 U.S.C. § 1267(g)(1)(A), and the Administrative Procedure Act

---

[6] EPA requests that the Court take judicial notice of EPA's Evaluation of Pennsylvania's 2018–2019 and 2020–2021 Milestones, Pennsylvania's Phase III WIP, and New York's draft amended Phase III WIP, and EPA's Key Developments in the Chesapeake Bay Watershed webpage. In adjudicating a 12(b)(6) motion, the Court may consider "matters about which the Court may take judicial notice." *Gustave–Schmidt v. Chao*, 226 F. Supp.2d 191, 196 (D.D.C. 2002). Courts may take judicial notice of "government documents available from reliable sources." *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (taking judicial notice of a document from the website of the United States Office of Personnel Management), *rev'd on other grounds sub. nom. Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012). The three documents at issue are government documents available from reliable sources.

("APA"), 5 U.S.C. §§ 551 *et seq.*, as well as the Chesapeake Bay Agreements. *Id*. On that same day, the Chesapeake Bay Foundation, Inc.; the Maryland Watermen's Association, Inc.; Anne Arundel County, Maryland; Robert Whitescarver; and Jeanne Hoffman (CBF Plaintiffs) filed an action alleging similar claims and supporting facts. *See* CBF Compl. The parties have jointly moved to consolidate these two actions. (Dkt. 14).

## II.     STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of an action for lack of jurisdiction. "Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction." *Sheppard v. United States*, 640 F. Supp. 2d 29, 33 (D.D.C. 2009). "'Sovereign immunity is jurisdictional in nature,' so a claim barred by sovereign immunity lacks subject matter jurisdiction and may be dismissed under a 12(b)(1) motion." *Scruggs v. Bureau of Engraving & Printing*, 200 F. Supp. 3d 78, 82 (D.D.C. 2016) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of an action for failure to state a claim upon which relief can be granted. A motion under Rule 12(b)(6) "challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim." *Davis v. Sarles*, 134 F. Supp. 3d 223, 226 (D.D.C. 2015). In making its determination on a 12(b)(6) motion, the Court may "consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted). The Court may also consider "documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *See Hinton v. Corr. Corp. of Am.*,

624 F. Supp. 2d 45, 46 (D.D.C. 2009) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).

## III.   ARGUMENT

### A.   Count I should be dismissed because CWA section 117(g) contains no nondiscretionary duty.

Plaintiffs allege that the Court has jurisdiction pursuant to the CWA citizen-suit provision, 33 U.S.C. § 1365(a)(2). States Compl. ¶ 1; CBF Compl. ¶¶ 10, 103, 114. The CWA waives sovereign immunity for citizen suits against EPA "where there is alleged a failure . . . to perform *any act or duty under this chapter which is not discretionary*" with the Agency. 33 U.S.C. § 1365(a)(2) (emphasis added). As with any waiver of sovereign immunity, this provision must be strictly construed and cannot be enlarged beyond its express terms. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) (waiver of sovereign immunity must be expressed "unequivocally . . . in statutory text"); *Conservation Law Found., Inc. v. Pruitt*, 881 F.3d 24, 28 (1st Cir. 2018) ("Because [the citizen-suit provision] is a waiver of sovereign immunity, it is to be 'construed strictly' in favor of the EPA." (quoting *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992)); *Sierra Club v. EPA*, 475 F. Supp. 2d 29, 31 (D.D.C. 2007) ("The citizen-suit provision of the [Clean Water Act] provides a limited waiver of sovereign immunity").

In a nondiscretionary duty suit under the CWA, the Court lacks subject matter jurisdiction if the plaintiff cannot show that EPA's "challenged course of action violates a nondiscretionary duty imposed . . . by the terms of the Act." *Monongahela Power Co. v. Reilly*, 980 F.2d 272, 276 (4th Cir. 1992); *see Sierra Club v. Thomas*, 828 F.2d 783, 788 (D.C. Cir. 1987) (finding that where statute does not impose a nondiscretionary duty, the court lacks jurisdiction). A statute imposes "'a nondiscretionary duty . . . only when [its] provision[s]

set . . . bright-line, date-specific deadlines for specified action.'" *Defenders of Wildlife v. Jackson*, 284 F.R.D. 1, 4 (D.D.C. 2012) (quoting *Raymond Proffitt Found. v. EPA,* 930 F. Supp. 1088, 1098 (E.D. Pa. 1996)); *Natural Resources Defense Council, Inc. v. Fox*, 30 F. Supp. 2d 369, 377 (S.D.N.Y. 1998) (finding that, because the CWA did not provide any particular date by which EPA had to intervene, the agency had "at least some discretion" to take action). In addition, the Court's jurisdiction is limited to "a narrowly-defined class of situations in which the Administrator failed to perform a mandatory function," *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1355 (9th Cir. 1978), or "purely ministerial acts." *Environmental Defense Fund v. Thomas*, 870 F.2d 892, 899 (2d Cir. 1989).

Here, Plaintiffs contend that CWA section 117(g) creates the requisite nondiscretionary duty. As stated above, section 117(g) provides:

> The [EPA] Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain [various goals of the Agreement].

33 U.S.C. § 1267(g)(1).

Section 117(g) does not create a nondiscretionary duty because it (1) imposes no date-certain deadline and (2) is not a discrete duty about which the agency has no discretion. Moreover, Plaintiffs cannot import a nondiscretionary duty from the Bay Agreement where none is imposed by section 117(g). Accordingly, Plaintiffs cannot fit their claims within the bounds of the CWA's citizen-suit provision. The Court should therefore dismiss Count I of each Complaint.

### 1.  Section 117(g) does not impose a "nondiscretionary duty" because it contains no date-certain deadline

Section 117(g) does not set a date-certain deadline for EPA to take any action. It cannot, therefore, give rise to a nondiscretionary duty within the scope of the CWA's citizen suit provision. *See Defenders of Wildlife*, 284 F.R.D. at 4. It is well established in the D.C. Circuit that "[i]n order to impose a clear-cut nondiscretionary duty, . . . a duty of timeliness must categorically mandate that *all* specified action be taken by a date-certain deadline." *Sierra Club v. Thomas,* 828 F.2d 783, 791 (D.C. Cir. 1987) (emphasis in original).[7] "In such circumstances," the court continued, "the only question for the district court to answer is whether the agency failed to comply with that deadline." *Id*. (internal quotation omitted); *see also American Lung Ass'n v. Reilly*, 962 F.2d 258, 263 (2d Cir. 1992); *Maine v. Thomas*, 874 F.2d 883, 888 (1st Cir. 1989). The necessary deadline must be clearly set out in the statutory text; "it is highly improbable that a deadline will ever be nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework." *Sierra Club v. Wheeler*, 330 F. Supp. 3d 407, 417 (D.D.C. 2018) (quoting *Sierra Club*, 828 F.2d at 791).

Here, Plaintiffs have not and cannot identify a date-certain deadline for EPA to perform any act. Section 117(g) contains no deadlines whatsoever, and thus cannot create a

---

[7] *Sierra Club* involved a claim under the citizen-suit provision of the Clean Air Act, which contains essentially the same language as CWA's citizen-suit provision. *Compare* 42 U.S.C. § 7604(a)(2) (allowing Clean Air Act citizen suit "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator"), *with* 33 U.S.C. § 1365(a)(2) (allowing Clean Water Act citizen suit "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator"). *See Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 699 (D.C. Cir. 1974) ("The citizen suits provision of section 505 [of the Clean Water Act] was explicitly 'modeled on the provision enacted in the Clean Air Amendments of 1970.'"); *City of Dover v. EPA*, 956 F. Supp. 2d 272, 281 n.4 (D.D.C. 2013) (analyzing Clean Water Act citizen-suit provision with reference to "nearly identical" Clean Air Act citizen-suit provision).

nondiscretionary duty to "ensure that management plans are developed and implementation is begun," let alone a nondiscretionary duty to achieve the goals of the Chesapeake Bay Agreement.

Plaintiffs hint that the Bay Agreement might supply the dates necessary for a nondiscretionary duty claim. *See* CBF Compl. ¶¶ 109–10, 113. But there *is* no deadline under the Agreement or otherwise applicable to any specific EPA action. Regardless, any deadlines contained in the Agreement itself cannot be read back into the Act to create a duty that does not exist on the face of the statute. Imputing such a duty would be as impermissible as imputing a deadline "by reason of an inference drawn from the overall statutory framework." *Id.* (quoting *Sierra Club*, 828 F.2d at 791). Absent a date-certain deadline, there is no nondiscretionary duty. Consequently, Plaintiffs' claims must be dismissed.

### 2. EPA's responsibility to "ensure" that the Bay Agreement states develop and implement management plans is not a ministerial action.

Beyond the lack of a date-certain deadline, section 117(g) does not require a discrete action about which the EPA has no discretion. Section 117(g) states that EPA "in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun" to achieve and maintain various goals of the Chesapeake Bay Agreement. 33 U.S.C. § 1267(g). The responsibility to "ensure" that the Bay States are developing and implementing appropriate plans is a far cry from the "purely ministerial acts" that may be compelled in a nondiscretionary duty suit. *Environmental Defense Fund*, 870 F.2d at 899.

As this Court has recognized, the mere presence of the word "shall" is not sufficient to create a nondiscretionary duty that can be enforced via an identical citizen-suit provision in the

Endangered Species Act.[8] *See California Native Plant Society v. Norton*, No. 03-1540, 2005 WL 768444, at *9 (D.D.C. Mar. 24, 2005). The statute at issue in *California Native Plant Society* provided that the United States Fish and Wildlife Service ("Service") "shall implement . . . a system to monitor effectively" certain species. *Id.* The plaintiffs alleged that the Service had violated a nondiscretionary duty by failing to implement an effective monitoring system. *Id.* The court rejected this argument:

> *Citizen suit provisions such as this one are quite narrow, allowing only for suits to force agencies to take purely ministerial actions, such as following mandatory deadlines.* The question is whether the "shall implement" language of the statute permits the invocation of the citizen suit provision. *The word "shall" of course connotes a statutory command, but the word "effectively" renders discretionary the details of how the command is executed.* The ESA's citizen suit provisions are therefore inapplicable, and the third count of the complaint states a claim as to which relief cannot be granted.

*Id.* (citation omitted, emphasis added); *see also Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 65–67 (2004) (holding that a statute requiring Bureau of Land Management to "manage" public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness" was not an action that could be compelled under the APA); *New York Public Interest Research Group v. Whitman*, 214 F. Supp. 2d 1, 3 (D.D.C. 2002) (under citizen-suit provision, the court "'has jurisdiction . . . to compel [EPA] to perform *purely ministerial acts*, not to order [EPA] to make particular judgmental decisions'") (quoting *Environmental Defense Fund*, 870 F.2d at 899 (emphasis added)). The acts that Plaintiffs seek to compel in this case are far from "ministerial." Section 117(g)'s direction—that EPA "shall

---

8 *Compare* 16 U.S.C. § 1540(g) (allowing Endangered Species Act citizen suit "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary"), *with* 33 U.S.C. § 1365(a)(2) (allowing Clean Water Act citizen suit "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator").

ensure that management plans are developed and implementation is begun" to achieve various goals—necessarily involves broad discretion. 33 U.S.C. § 1267(g). While the use of the word "shall" in section 107(g) "of course connotes a statutory command," 2005 WL 768444, at *9, its lack of *any* discrete, ministerial action "renders discretionary the details of how the command is executed." *Id.*

Had Congress wished to impose on EPA a nondiscretionary duty in section 117(g), it knew how to do so. Elsewhere in the CWA, Congress requires EPA to review and either approve or disapprove state-adopted water quality standards within a specified time-frame. 33 U.S.C. § 1313(c)(3). And if a state does not set water quality standards—or if EPA determines that a state's standards do not meet the requirements of the CWA—EPA must promulgate the water quality standards for the state. *Id.* § 1313(b), (c)(3)–(4). Likewise, the CWA requires EPA to approve or disapprove state-submitted impaired waters list and TMDLs within thirty days. *Id.* § 1313(d)(2). In section 117(g), Congress imposed no such enforceable, nondiscretionary requirements on EPA.

### 3. Plaintiffs cannot import a nondiscretionary duty from the Agreement where none is imposed by statute.

Perhaps recognizing that section 117(g) imposes no nondiscretionary duty, the Chesapeake Bay Foundation Plaintiffs allege that EPA's duties are not limited by the face of section 117(g). Plaintiffs allege that EPA's obligation is not merely to ensure that "plans are developed and implementation is begun" to achieve the goals of the Agreement; it is, instead, to ensure that those goals *are actually achieved. See* CBF Compl. ¶ 111 (alleging that certain goals of the Chesapeake Bay Agreement "are the goals Section 117 requires *the Administrator* to achieve") (emphasis added); CBF Compl. ¶¶ 112, 115 (alleging that both section 117(g) *and the*

*Chesapeake Bay Agreement* impose enforceable duties on the EPA); *compare* 33 U.S.C.

§ 1267(g)(1).

Plaintiffs' theory is that:

· The Chesapeake Bay Agreement contains a number of goals, including a water-quality goal. *See* CBF Compl. ¶¶ 109–113.
· Section 117(g) allegedly requires EPA to take "specific steps" to achieve these goals. *Id.* ¶ 101.
· This means that EPA has a nondiscretionary duty to ensure that the goals are, in fact, achieved. *See id.* ¶¶ 105, 111–12, 115.
· The relevant goals have not been, or will not be, achieved. *See id.* ¶ 89
· EPA has therefore failed to perform a nondiscretionary duty. *See id.* ¶¶ 114–15.

Plaintiffs cannot bootstrap an actionable nondiscretionary duty into existence in this fashion. *See Rushing v. Leavitt*, No. 03-1969, 2005 WL 555415, at *5 (D.D.C. Mar. 7, 2005) (court can only order EPA to take nondiscretionary actions required by the statute itself). To support their theory that Congress required EPA to ensure that the goals of the Bay Agreements are actually achieved, not merely that signatories develop and begin implementing plans aimed at achieving those goals, CBF Compl. ¶ 111, Plaintiffs cite to the Congressional findings accompanying the passage of section 117(g), in which Congress stated that one of the purposes of that section is "to achieve the goals established in the Chesapeake Bay Agreement." *See id.* ¶ 114 (citing 114 Stat. at 1967). The location of this statement, however, undercuts rather than supports Plaintiffs' claims. It demonstrates that Congress contemplated that the goals of the Chesapeake Bay Agreement would be achieved—but nonetheless opted *not* to write a statute that requires EPA to take specific, discrete acts to do so.[9] Further, the legislative history of section

---

[9] Given the complexity of the environmental problems facing the Bay, and the multi-state and multi-agency effort required to address them, it is hardly surprising that Congress did not choose to burden EPA with a nondiscretionary obligation to ensure the goals of the Agreement are achieved. The Agreement itself contemplates that achievement of the goals contained in the Agreement will require efforts by *all* of the signatories. *See* Chesapeake Bay Watershed

117(g) indicates that Congress intended EPA to fulfill its role under 117(g) via implementation of the grants program Congress provided in section 117(e): "The Committee expects EPA to meet the requirements of this paragraph through the award of implementation grants under subsection (e)."[10]

In sum, Plaintiffs have failed to establish the existence of any nondiscretionary duty that might enable them to invoke the CWA's citizen-suit provision. Count I of Plaintiffs' complaints must therefore be dismissed for lack of subject matter jurisdiction and for failure to state a claim for which relief may be granted. *See Rushing*, 2005 WL 555415, at *11 (dismissing complaint for lack of jurisdiction and for failure to state a claim for which relief may be granted where plaintiff had failed to identify mandatory duty).

### B. EPA's alleged "approval" of New York and Pennsylvania's Phase III WIPs is not a final agency action reviewable under section 706(2) of the APA.

Plaintiffs' second claim is similarly unavailing. Both the State and CBF Plaintiffs allege that EPA "approved" Pennsylvania and New York's Phase III WIPs, and that "approval" must be set aside as arbitrary or capricious under section 706(2) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). *See* State Compl. ¶ 93; CBF Compl. ¶ 118. EPA's evaluation of the Phase III WIPs, incorporated by reference into the complaints, does not purport to be an "approval" of those plans—indeed, each expressly states that "EPA does not approve or disapprove a WIP." *See e.g.*, Eval. of PA Phase III WIP at 3. Neither the CWA, the Bay TMDL, nor the accountability framework to implement the Bay Agreement establishes or requires an

---

Agreement (Ex. A) at 1 ("The signatories to this voluntary Agreement commit to achieving the restoration and protection of the Chesapeake Bay watershed and its living resources.").

[10] *See* H.R. Rep. No. 106-550, at 3 (2000), Committee on Transportation and Infrastructure on the Chesapeake Bay Restoration Act of 1999, submitted by Rep. Shuster (Mar. 29, 2000) at p. 3.

EPA WIP "approval" process. Nevertheless, Plaintiffs appear to infer "approval" from EPA's evaluation of New York and Pennsylvania's Phase III WIPs because the Agency suggested ways that the states could adjust their efforts to meet their state planning goals and did not impose federal backstops. *See* State Compl. ¶ 53; CBF Compl. ¶ 119.

Plaintiffs' inference is insufficient to state a claim for relief under APA section 706(2). The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see SUWA*, 542 U.S. at 61–62. Because the absence of "final agency action" in an APA suit results in a failure to state a claim, *see Center for Auto. Safety v. NHTSA*, 452 F.3d 798, 811 (D.C. Cir. 2006), the existence of finality is a "threshold question[]" that determines whether judicial review is available, *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). The court must find both that the action challenged is an "agency action" as defined in the APA, and that the action is "final." *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990).

EPA's evaluation of New York and Pennsylvania's Phase III WIPs is neither "agency action" nor a "final" agency action. First, it is not "agency action," as defined by the APA, 5 U.S.C. § 551(13), because the evaluations are planning and advisory documents without legal effect: they do not change the legal obligations of EPA, the states, or regulated entities within the states. Second, the evaluations are not *final* agency action under 5 U.S.C. § 704 because they do not have legal consequences and because they are not a "consummation" of any EPA decisionmaking process. Given the iterative nature of the states' ongoing planning and implementation of the Bay Agreement's goals—and the fact that the states' implementation of the actions set out in their WIPs are completely within the states' purview—EPA's evaluation of the Phase III WIPs is not its final say on whether those goals will be achieved or maintained.

EPA's evaluations are to inform the Bay Agreement states (and the public) as to their progress and the strengths and shortcomings of their plans. Indeed, both states have committed to revising their WIPs in light of EPA's recommendations. Accordingly, EPA's evaluation and its alleged failure to impose, therein, federal backstop measures is not final for purposes of judicial review.

### 1. EPA's evaluation of the Phase III WIPs is not an "agency action" under the APA.

Plaintiffs' APA claims fail for lack of the fundamental prerequisite for judicial review under the APA: a "legal wrong because of agency action." 5 U.S.C. § 702. Plaintiffs allege that EPA's "approval" of New York and Pennsylvania's Phase III WIPs is an "agency action" subject to review. *See* States Compl. ¶ 53; CBF Compl. ¶¶ 90, 120. More precisely, Plaintiffs allege that because EPA recommended ways that New York and Pennsylvania could enhance their pollutant-reduction response to meet the Bay Agreement's 2025 goals without imposing, at this time, federal backstop measures, that inaction constitutes "approval." It does not.

The APA defines "agency action" to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Each of those terms—rule, order, license, sanction, relief—is separately defined in the statute. *See id.* § 551(4), (6), (8), (10), and (11). Although the D.C. Circuit has found that the term "agency action" "undoubtedly has a broad sweep," it has also recognized it "is not so all-encompassing as to authorize [courts] to exercise 'judicial review [over] everything done by an administrative agency.'" *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Indeed, the Supreme Court has stated that "agency actions" are only "circumscribed, discrete agency actions," not general deficiencies in compliance or program administration. *SUWA*, 542 U.S. at 62, 66, 68.

In that vein, the D.C. Circuit has found agency acts do not amount to APA "agency actions" where they do not effect a change in law or have a binding, legal effect either on the agency or regulated parties. For instance, the D.C. Circuit has held that courts lack authority to review claims where "an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001). Similarly, in *Independent Equipment Dealers Association*, the D.C. Circuit found that a letter restating the agency's longstanding interpretation of its regulations was not a reviewable "agency action" because it was "purely informational in nature." 372 F.3d at 427. Because the letter did not change the regulatory regime and "imposed no obligations and denied no relief," the Court held it was not "agency action." *Id*.

The D.C. Circuit has also dismissed challenges to proposals and planning that are precursors to more discrete, legally significant actions for lack of reviewable "agency action." In *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, the court held that the Bureau's "strategy," for addressing overpopulation in the federally managed wild horse and burro population, embodied in a budget request to Congress, was not a reviewable "agency action because it did not "implement, interpret, or prescribe" "law or policy." 460 F.3d at 20. "The most that can be said" about the request "is that it outlines the goals and methods of an administrative program," and "[a]lthough the 'strategy' likely guides this process, it does not carry the legal significance [plaintiff] assigns to it." *Id*. at 22.

The alleged "action" challenged here is akin to those agency acts that courts have concluded are not "agency action" under the APA. On their face, EPA's evaluations of the Phase III WIPs evince no approval or other agency act with legal consequences. They are, as their titles suggest, "*evaluations*." Indeed, they expressly state that "EPA does not approve or disapprove a

WIP," but rather "provides [its] assessment for the benefit of the [Chesapeake Bay Program] jurisdictions, and, as appropriate, may provide additional recommendations for strengthening the WIP or its components." *See e.g.,* Eval. of PA Phase III WIP at 3. The evaluations, which recommended measures the states could undertake, are better characterized as advisory or planning documents, rather than actions with legal effects.

For instance, EPA's evaluation of New York's WIP states that while the WIP meets planning targets in some respects, New York's plan "falls short" of its nitrogen planning target. Eval. of NY Phase III WIP at 1. The evaluation then recommends ways that New York could strengthen its practices and programs to meet that planning target. *Id*. at 1, 4–5, 8. Similarly, EPA's evaluation of Pennsylvania's Phase III WIP notes that "Pennsylvania's current planned efforts do not achieve the nitrogen Phase III WIP planning target" and recommends actions Pennsylvania can take to change that. Eval. of PA Phase III WIP at 1, 4, 5–7. In both evaluations, EPA states that it "stands ready to assist in that development in any way possible." *Id*. at 1; Eval. of NY Phase III WIP at 1.

These evaluations are consistent with EPA's role in the WIP process under the accountability framework: to evaluate states' plans and provide guidance to assist states in their TMDL and Bay Agreement implementation efforts. EPA is there to "improve" each state's "accountability *to the [Chesapeake Bay Program] partnership*." Eval. of PA Phase III WIP at 5 (emphasis added). Neither the TMDL nor the accountability framework requires an EPA approval or disapproval of the Phase III WIPs. *See* Bay TMDL at 1-16 ("While the accountability framework informs the TMDL, section 303(d) does not require that EPA 'approve' the framework *per se*, or the states' WIPs that constitute part of that framework."). Rather, "EPA's commitment to take appropriate action" as a part of that framework identifies

EPA's discretionary authorities to take certain actions including a "list of *potential* actions EPA *may* take." *Id.* at 7-12 (emphasis added). In short, there is no statutory, regulatory, or other requirement that EPA approve WIPs—and Plaintiffs identify none.

Nor does section 117(g) of the CWA require EPA's approval of the states' Chesapeake Bay "management plans." [11] That is in stark contrast to, for instance, the provisions of the CWA that expressly require EPA to act on state water quality standards, impaired waters lists, or TMDLs. *See* 33 U.S.C. § 1313(c) (providing that states' water quality standards "shall be submitted to" EPA, and that EPA must notify the state within 90 days if it disapproves the standard, and issue an alternative standard if the state does not make adequate changes to the deficient standard); *id.* § 1313(d)(2) (providing that EPA "shall either approve or disapprove" of impaired waters lists or TMDLs "not later than thirty days after the date of submission"). Given that Congress has demonstrated that it knows how to create a mandatory, legally significant approval process in these other contexts, it would be inappropriate to infer one from section 117(g)'s language. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusion alterius.*").

EPA's evaluation also has no legal effect on the WIPs. It does not change the WIPs' legal status, force, or effect. It does not change EPA's, the states', or third parties' obligations or rights. *See, e.g.*, Eval. of PA Phase III WIP at 4 n.2 ("This Evaluation is not a final agency action, and does not create any right, responsibility, or benefit, substantive or procedural, enforceable by law or equity."). It does not alter the regulatory obligations of sources ultimately

---

[11] Although the WIPs are a creature of the accountability framework, EPA interprets the phrase "management plans" in CWA section 117(g) to include the WIPs. Bay TMDL at 1-16.

regulated under the CWA or state water quality programs. And Plaintiffs have not alleged—and cannot show—otherwise.

The fact that EPA has, in the past, announced that it could take federal backstop measures in its evaluation of WIPs—or actually *did* take such measures after its evaluation—does not change the character of the evaluations at issue here. Although the accountability framework envisions that EPA has discretion to take federal backstop measures, it does not require EPA to take such action. To the extent Plaintiffs ask the Court to *compel* agency action, *see* CBF Compl. at 36 (requesting that the Court "[o]rder the Defendants to take appropriate actions to ensure that Pennsylvania's and New York's Phase III WIPs will achieve and maintain the nutrient reduction and water quality goals of the Chesapeake Bay Agreement and the Bay TMDL); States Compl. at 24 (substantially the same), they must make a claim under APA section 706(1), not 706(2). Plaintiffs, however, have not alleged, as needed to state a claim under section 706(1), that EPA has failed to take some "discrete" action it is "required" to take, *SUWA*, 542 U.S. at 64. There is no required action to compel. As discussed *supra*, the so-called EPA backstop measures are entirely discretionary. If Plaintiffs believe that New York and Pennsylvania are not upholding the Bay Agreement, they can appeal to those states directly or petition EPA to take direct federal action.

Without any legal effect or other hallmarks of "agency action," EPA's evaluation of the Phase III WIPs is not reviewable under the APA. The Court should dismiss Plaintiffs' APA claims.

### 2. The evaluation of New York and Pennsylvania's Phase III WIPs is not "final" agency action.

Even if EPA's evaluation of the Phase III WIPs is considered an "agency action," it is not a "final" agency action under APA section 704, 5 U.S.C. § 704. The Supreme Court has

explained that two conditions must be satisfied for agency action to be "final." "First, the action must mark the 'consummation' of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). Second, the agency action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Commission*, 324 F.3d 726, 731 (D.C. Cir. 2003). Plaintiffs' APA claims fail in both respects.

Most fundamentally, as discussed above, EPA's evaluation of New York's and Pennsylvania's Phase III WIPs does not "determine" any "rights or obligations" and does not otherwise have legal consequences. *See supra* Part III.B.1. It does not have "binding effects on private parties or on the agency." *General Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004). It does not compel any party or regulated entity to do anything, nor prevent them from acting. *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 732 (finding no final agency action where "there has been no order compelling [the regulated entity] to do anything."). It did not change anyone's legal obligations. *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Indeed, each evaluation expressly stated that it "is not a final agency action, and does not create any right, responsibility, or benefit, substantive or procedural, enforceable by law or equity." *See e.g.*, Eval. of PA Phase III WIP at 4 n.2; *see Nat'l Ass'n of Home Builders*, 415 F.3d at 14 (an agency's characterization of its own action "is entitled to respect in a finality analysis"). Accordingly, there is no final action for the purpose of judicial review.

In addition, the evaluations do not mark the consummation of EPA's decisionmaking process with respect to the Phase III WIPs or the states' commitment to meeting the Bay TMDL goals by 2025. As discussed above, there is no real "decisionmaking process" to consummate:

EPA does not "approve" WIPs; its evaluations of WIPs and milestones are intended to provide the Partnership and the larger public a clear accounting of progress made by a jurisdiction with respect to the commitment to meet the Partnership's goals including the target loads. EPA's evaluation of the WIPs also does not consummate any decisionmaking process with respect to whether the states will achieve and maintain the Bay Agreement's goals. In the Chesapeake Bay, the Partnership makes the final decisions collectively and voluntarily. Through the decades, the Partnership has refined its goals and timelines to achieve those goals. EPA continues to coordinate and provide a clear accounting of progress as well as technical assistance to each of the Bay States so that they may implement those collective goals. In addition, the structure of the accountability framework for meeting those goals includes two-year milestones, which are meant to be the states' way to provide detail as to how they would implement their WIPs in two-year increments. Those milestones can change the levels of implementation a state chooses to accomplish.

Consistent with EPA's role in that process, each of the challenged evaluations state EPA's ongoing commitment to assist the states in developing revised plans or two-year milestones that will fully address the states' Bay restoration commitments. Eval. of PA Phase III WIP at 1; Eval. of NY Phase III WIP at 1. EPA stated that it "plans to continue to commit staff, contractual, and funding resources to support the implementation" of the WIPs "and future two-year milestones." Eval. of PA Phase III WIP at 4; Eval. of NY Phase III WIP at 3.

These statements do not indicate a conclusive agency determination. Rather, they reflect the fact that developing, executing, and overseeing implementation strategies under the TMDL and the Bay Agreement is an ongoing, iterative process. EPA's evaluation of the WIPs is not the final word on these states' continuing work toward meeting the Bay restoration goals; it serves as

a guide for the states to adjust and enhance that work. *See Chemical Manufacturers Ass'n v. EPA*, 26 F. Supp. 2d 180, 183–85 (D.D.C. 1998) (agency policy was not consummation of decision-making process because it merely served as a guide to future proceedings). In determining finality, "the relevant question is not whether the action concludes *a* decisionmaking process—such as what a policy published in the Federal Register is to contain—but whether the action concludes *the* decisionmaking process—that is, a broader process that impacts individual parties and their rights and obligations." *Id.* at 183 n.2 (emphasis in original). The broader process contemplated by section 117(g) here is EPA's general oversight of the states' ongoing implementation of measures to meet the Bay TMDL's 2025 restoration goals. EPA's evaluation of the Phase III WIPs does not purport to close the book on those measures.

Indeed, both New York and Pennsylvania have committed to revise their Phase III WIPs to close the gap between the reductions provided for in their plans and those needed to meet the TMDL's goals. New York has shared a draft amended Phase III WIP with EPA that aims to do just that. EPA will evaluate the amended WIP as the accountability framework envisions. Similarly, in its Phase III WIP, Pennsylvania committed to a process to revisit and revise its WIP to put in place the controls necessary to achieve the 2025 phosphorus and nitrogen targets through its two year milestone process and by completing the remaining County Action Plans. Consistent with that commitment, in its 2020–2021 two-year milestone document, Pennsylvania has committed to finalizing County Action Plans by the end of 2021 that would ensure it meets the Bay Agreement's 2025 targets. Eval. of PA's 2018–2019 and 2020–2021 Milestones. EPA's evaluation of Pennsylvania's milestones recognizes the state's commitment "to amend the Phase III WIP by December 2021, to incorporate the remaining County Action Plans (CAPs) to ensure Pennsylvania closes the 9.8 million-pound nitrogen gap to meet the 2025 targets." *Id.* Both New

York and Pennsylvania's planned WIP revisions will be completed well before the Bay

Agreement's 2025 target.

In sum, EPA's evaluation of the Phase III WIPs is not a final agency action and is

therefore not subject to judicial review. The Court should dismiss Plaintiffs' APA claims.

## IV.  CONCLUSION

For the reasons set forth above, EPA respectfully requests that the Court dismiss the

complaints.


DATED: November 20, 2020.


*/s/ Sarah A. Buckley*
SARAH A. BUCKLEY
ELLIOT HIGGINS
Trial Attorneys
Environmental Defense Section
P.O. Box 7611 Washington, D.C. 20044
(202) 616-7554 (Buckley)
(202) 598-0240 (Higgins)
202-305-8865 (Fax)
sarah.buckley@usdoj.gov
elliot.higgins@usdoj.gov


*Counsel for Defendants*


Of Counsel:

Alec Mullee
Attorney-Advisor
Office of General Counsel
U.S. Environmental Protection Agency
mullee.alexander@epa.gov
202-564-9616

Kim Kramer
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
kramer.kim@epa.gov
212-637-3238

Christopher A. Day
Senior Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
day.christopher@epa.gov
215-814-2481

Kelly Gable
Senior Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
gable.kelly@epa.gov
215-814-2471

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2020, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Sarah A. Buckley*
SARAH A. BUCKLEY