**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHESAPEAKE BAY FOUNDATION, *et al.*, | 1:20-cv-2529 (CJN) |
| Plaintiffs, | |
| v. | |
| ENVIRONMENTAL PROTECTION AGENCY, *et al*. | |
| Defendants. | |

| | |
|---|---|
| STATE OF MARYLAND, *et al.*, | 1:20-cv-2530 (CJN) |
| Plaintiffs, | |
| v. | |
| ANDREW R. WHEELER, *et al*. | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPLETE
OR SUPPLEMENT THE ADMINISTRATIVE RECORD INDEX**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 1

ARGUMENT .................................................................................................................... 6

   I.    EPA'S CERTIFIED RECORD INDEX IS INCOMPLETE BECAUSE IT OMITS
DOCUMENTS THAT WERE BEFORE THE AGENCY AT THE TIME OF ITS
DECISIONS................................................................................................................. 6

      A.     EPA has impermissibly excluded documents relating to the creation of the Accountability
Framework in the Chesapeake Bay TMDL. ................................................................... 7

      B.     EPA has impermissibly excluded documents developed during the Phase I and Phase II WIP
approval processes. ...................................................................................................... 10

      i.    Certain Phase I and Phase II documents are already referenced in the administrative record
index........................................................................................................................... 11

      ii.    The Phase III WIPs expressly look back to Phase I and Phase II. ............................. 12

      iii.    The interim milestone evaluations illustrate the interconnected nature of all three WIP
phases. 13

   II.    IN THE ALTERNATIVE, THE MISSING DOCUMENTS SHOULD BE INCLUDED
AS EXTRA-RECORD EVIDENCE.......................................................................... 17

CONCLUSION................................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Am. Farm Bureau Fed'n v, United States EPA,* 792 F.3d 281 (3rd Cir. 2015). .......................... 12

*Amfac Resorts, LLC v. United States Dep't of the Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001)...... 7

*Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971). ............................................ 7

*City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581 (D.C. Cir. 2010) ........................... 17

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2008) ..................................................................... 18

*Marcum v. Salazar*, 751 F. Supp. 2d 74 (D.D.C. 2010) ......................................................... 7, 11*

*Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73 (D.D.C. 2018) ....................................................... 7, 17*

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................................................................ 7

*Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1 (D.D.C. 2015) ........... 7, 17*

**Statutes**

33 U.S.C. § 1267(g) .................................................................................................................... 3, 9

5 U.S.C. § 706(2)(A)...................................................................................................................... 7

**Other Authorities**

EPA, *Chesapeake Bay Milestones,* https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-milestones .................................................................................................................................... 3

EPA, *Chesapeake Bay TMDL:  Phase III WIPs*, https://www.epa.gov/chesapeake-bay-tmdl/phase-iii-wips .................................................................................................................... 5

## INTRODUCTION

Plaintiffs in these consolidated cases file this memorandum in support of their Motion to Complete or Supplement the Administrative Record. The index to the administrative record filed by Defendant U.S. Environmental Protection Agency ("EPA") on April 27, 2021, and supplemented on July 16, 2021, is missing key categories of documents that were before EPA at the time it made the decision at issue in this case, and either were considered or should have been considered by EPA. *See* Exh. A, Plaintiffs' Index of Documents Missing From the Administrative Record; Exh. B, Declaration of Jon Mueller in Support of Motion. Specifically, Plaintiffs seek the inclusion of documents related to (1) the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL") Accountability Framework; and (2) EPA's Bay TMDL Phase I and Phase II Watershed Implementation Plan (WIP) evaluations, including two-year milestone evaluations.

To complete the administrative record in this case, Plaintiffs ask the Court to order EPA to include the attached exhibits and to search for additional documents where necessary to complete the administrative record index, as discussed below. Alternatively, Plaintiffs ask the Court to order that the record be supplemented with the attached exhibits.

## STATEMENT OF FACTS

Plaintiffs initiated these actions under the Clean Water Act and the Administrative Procedure Act against the EPA and its Administrator for acting arbitrarily and capriciously by approving the facially deficient Pennsylvania and New York Phase III WIPs developed pursuant to the Chesapeake Bay TMDL. Plaintiffs also claim that the EPA and its Administrator failed to perform mandatory duties under the Clean Water Act by failing to require Pennsylvania and New York to submit sufficient Phase III WIPs.

1

EPA issued the Chesapeake Bay TMDL for the Bay and its tributaries in 2010. (AR 43655).[1] The Bay TMDL sets pollution limits for the discharge of nitrogen, phosphorus, and sediment into the Bay and its tributaries for each of the seven Bay jurisdictions: the District of Columbia, Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia. The Bay TMDL requires each jurisdiction to submit three WIPs to demonstrate how it would meet the requirements to attain water quality standards by 2025. (AR 43655). The Phase I WIPs, submitted in 2010, determined the basin allocations for each jurisdiction and contained broad actions and controls to be implemented by 2017 to achieve water quality standards. (AR 43662-63, 43910). The Phase II WIPs, submitted in 2012, elaborated on the Phase I WIP by containing more specific local actions and controls. (AR 43668, 43910). The Phase III WIPs, submitted in 2019, are designed to provide additional details of actions beyond 2017 to ensure the 2025 goals are met. (AR 43668, 43910).

Prior to the due date for each of the three WIPs, EPA established and announced detailed expectations for what each jurisdiction's WIP should include. The WIPs were required to detail how point source and nonpoint sources of pollution will reduce nutrients in the amounts required by the Bay TMDL, and thus to provide reasonable assurance to EPA that the goals of the TMDL will be met. (AR 37831, 37832). In fact, "since 2008, EPA Region 3 has communicated its heightened expectations for reasonable assurance in the Chesapeake Bay watershed and its basis for expecting the jurisdictions' WIPs to assist in the demonstration of that reasonable assurance." (AR 37832). As EPA stated in the Bay TMDL, "the two most important criteria for a WIP [are] that it achieves the basin-jurisdiction pollution allocations and meets EPA's expectations for

---

[1] "AR" references are to the Supplemental Record Index filed by the United States.  Doc. No. 29-2.  Copies of "AR" documents cited here can be found in Exhibit C. See, Exh. B, Declaration of Jon Mueller.

providing reasonable assurance that reductions will be achieved and maintained, ….” (AR 43663). EPA and the Bay jurisdictions agreed that EPA would oversee and evaluate the jurisdictions’ TMDL progress, and that EPA would either amend a jurisdiction’s pollution allocations or impose consequences against the jurisdiction as necessary to ensure that the Bay jurisdictions adhered to the terms of the Chesapeake Bay Agreement consistent with section 117(g) of the Clean Water Act. *See* 33 U.S.C. § 1267(g). (AR 37832). The Bay jurisdictions’ WIPs are the backbone of the TMDL and show how each jurisdiction will meet its pollution reduction requirements. (AR 43677).

For more than a decade, EPA has overseen each Bay jurisdiction’s performance through an iterative evaluation process that has included WIPs and interim two-year milestone evaluations. The two-year milestones are interim goals designed to increase restoration work and ensure progress towards the TMDL allocations. (AR 43711, 43911). EPA and the Bay jurisdictions agreed to establish these two-year milestone goals over the course of the entire Bay TMDL implementation in recognition that past long-term restoration goals had been unsuccessful because they lacked interim accountability. *See* EPA, *Chesapeake Bay Milestones,* https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-milestones (last accessed Aug. 2, 2021). All parties to the Bay TMDL and Chesapeake Bay Agreement[2]—including EPA—agreed to a 2025 deadline to meet the Bay TMDL goals. They also agreed that EPA would take action if a jurisdiction failed to develop and submit an adequate WIPs or meet its respective milestone

_____

[2] The 2014 Chesapeake Bay Watershed Agreement is a multistate compact signed by the Bay jurisdictions and the federal government, including the EPA, committing to achieving Chesapeake Bay restoration, including the goals of the Bay TMDL. (AR 1029).  The 2014 Agreement was amended on January 24, 2020. https://www.chesapeakebay.net/documents/FINAL_Ches_Bay_Watershed_Agreement.withsignatures-HIres.pdf

targets. (AR 37832). Until 2017, EPA had taken action against recalcitrant jurisdictions, including withholding grant funds and imposing backstop allocations on sectors behind on target reductions. (AR 38647) (illustrating EPA placing the agriculture and stormwater sectors in the "backstop" category requiring enhanced oversight); (AR 30771) (defining "Backstop Actions Level" to mean that "[h]aving identified substantial concerns with a jurisdiction's actions to meet the TMDL goals, EPA has taken federal actions to help the jurisdiction get back on-track"); (AR 43664-67) (further evidence of TMDL backstop measures and enhanced EPA oversight).

A unique feature of the Bay TMDL is the Accountability Framework. The Accountability Framework includes the "watershed implementation plans, the two-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal contingency actions if the jurisdictions do not meet their commitments." (AR 43662). The Accountability Framework is an adaptive management approach that assesses implementation progress and "determines the need for alternative management measures" based on the incremental assessments. (AR 43905). Key to the Accountability Framework is federal oversight of the WIPs, including EPA's authority to modify the TMDL, increase oversight of permitting, and use its residual designation authority to increase the number of permitted sources. (AR 43905).

In 2019, the Bay jurisdictions submitted draft and final Phase III WIPs to EPA for evaluation. In its review, EPA found that Pennsylvania's draft Phase III WIP would achieve only 64% of the nitrogen reduction requirements and 76% of the phosphorus reduction requirements called for by the Bay TMDL. (AR 39124). It also found that New York's draft Phase III WIP would achieve only 61% of its nitrogen reduction requirements. (AR 39107). Instead of imposing backstop measures during the draft WIP stage, however, EPA departed from past practice and only noted "potential enhancements." (AR 39108-11); (AR 39127-32). In August

4

2019, the Bay jurisdictions submitted their final Phase III WIPs, but Pennsylvania and New York's still fell short. Pennsylvania's final Phase III WIP met only 75% of the state's nitrogen reduction requirements and had a funding shortfall of over $300 million a year for the next five years. (AR 39133). New York's final Phase III WIP met only 66% of the state's nitrogen reduction requirements, missing the target reductions by nearly one million pounds of nitrogen per year. (AR 39112). Despite both WIPs being facially deficient, on December 19, 2019, EPA approved both WIPs and did not assert backstop measures or consequences against Pennsylvania and New York to bring their WIPs into compliance with the Bay TMDL. (AR 43583, 43915); (AR 39133–48); (AR 39112–22). The other Bay jurisdictions, including the Plaintiffs here, provided sufficient Phase III WIPs and have committed to undertake the programs and expenditures necessary to achieve the 2025 TMDL goals, in reliance on the Bay Agreement and EPA's adherence to the TMDL Accountability Framework. *See* EPA, *Chesapeake Bay TMDL: Phase III WIPs*, https://www.epa.gov/chesapeake-bay-tmdl/phase-iii-wips (last accessed Aug. 2, 2021).

Plaintiffs challenged EPA's approval of Pennsylvania and New York's Phase III WIPs in this Court on September 10, 2020. (Complaint, Doc. 1, *Chesapeake Bay Foundation v. EPA,* Case No. 1:20-cv-02529-CJN; Complaint, Doc. 1, *State of Maryland, et. al v. EPA,* Case No.1:20-cv-02530-CJN). Plaintiffs allege, among other claims, that Defendants acted arbitrarily and capriciously in violation of the Administrative Procedure Act by approving facially deficient Phase III WIPs. *Id.* On November 20, 2020, Defendants filed a motion to dismiss the complaints and sought a suspension of the requirement to file the administrative record while filing a motion to dismiss the case. (Doc. 15, 16). The Court denied the request, explaining that the contents of the administrative record may bear on whether the EPA's challenged decisions constitute final

agency action. (Minute Order Dec. 3, 2020). EPA subsequently filed the certified administrative record index on April 27, 2021. (Doc. 24-1).

Plaintiffs subsequently identified significant flaws and omissions in the administrative record and raised these issues with Defendants. EPA agreed to supplement the record with certain enumerated documents, and EPA filed a supplement to the record index on July 16, 2021. (Doc. 29). This motion seeks categories of documents as to which the Parties could not come to an agreement – specifically, documents relating to the Phase I and Phase II WIP development and approval processes (including documents relating to the Bay jurisdictions' interim Bay TMDL milestone reports), as well as documents relating to EPA's development of the Bay TMDL accountability framework. Because of the iterative nature of the Bay TMDL process, it would have been illogical, and certainly arbitrary, for EPA not to consider these documents, either directly or indirectly, when reaching the decision at issue here.

## ARGUMENT

### I. EPA'S CERTIFIED RECORD INDEX IS INCOMPLETE BECAUSE IT OMITS DOCUMENTS THAT WERE BEFORE THE AGENCY AT THE TIME OF ITS DECISIONS.

EPA has not properly compiled the administrative record index, as it has omitted key documents that were before the agency during the decision-making process. Critically, EPA has failed to include documents relating to the establishment of the Accountability Framework in the Chesapeake Bay TMDL – a linchpin of EPA's obligation to take action when a Bay jurisdiction fails to meet its obligations under the TMDL. Additionally, EPA has included no documents from the Phase I and Phase II WIP evaluation processes in the current record. Because Bay TMDL goal attainment is an iterative process, these documents necessarily form part of the basis for EPA's assessment of the final Phase III WIPs.

Courts review agency action under the Administrative Procedure Act to determine whether the agency's action was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). In order to conduct this review, the Court must look to the "full administrative record that was before the [Administrator] at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971). The whole record includes all information that the agency considered either directly or indirectly. *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010). The administrative record should include "all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision." *Amfac Resorts, LLC v. United States Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (internal quotations omitted).

In addition, a party may seek to add documents to the administrative record "that should have been properly a part of the administrative record but [were] excluded by the agency." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) ("*Oceana I*") (quoting *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015)). The moving party must make a showing of "concrete evidence" and "identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record." *Marcum*, 751 F. Supp. 2d at 78 (quoting *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)).

A.    EPA Has Impermissibly Excluded Documents Relating to the Creation of the Accountability Framework in the Chesapeake Bay TMDL.

EPA has failed to include documents relating to the establishment of the Bay TMDL Accountability Framework – a unique feature of the Chesapeake Bay TMDL agreed to by the Bay jurisdictions and EPA to ensure that EPA would step in if a Bay jurisdiction failed to meet its obligations under the TMDL.

7

In 2010, EPA established the Bay TMDL, which set pollution limits for the entire 64,000-square-mile watershed and directed the Bay jurisdictions to create WIPs in three phases. (AR 43655). The WIPs detail how the jurisdictions will meet their pollution-reduction allocations through regulatory programs and pollution-reducing practices. (AR 43909). The Bay TMDL was the culmination of years of planning and compromise. (AR 20284-85, 43704-10). Two critical elements of the Bay TMDL were the establishment of a final deadline with interim goals and accountability for meeting that deadline and the interim goals. *See* Exh. A,[3] Doc. 13, pg. 77 (EPA letter to Principals' Staff Committee with revised three-phase process to ensure Bay TMDL completed by the December 2010 deadline) (June 11, 2010); Doc. 26, pg. 439 (EPA PowerPoint presented by Jon Capacasa and Katherine Antos at Principals' Staff Committee meeting – Draft Expectations for WIP) (Oct. 23, 2009).

The Accountability Framework gave EPA broad authority to monitor performance by the jurisdictions, mandate compliance, and impose "backstops" or sanctions for non-compliance. EPA, however, has excluded numerous documents relating to the creation of the Accountability Framework from the administrative record, including correspondence between the Bay jurisdictions and EPA setting expectations for enforcement if Bay jurisdictions developed WIPs without reasonable assurance that they would attain the TMDL's nutrient reduction goals. Other documents missing from the record include correspondence regarding the schedule for TMDL implementation, and the interrelated nature of the three WIP phases. Exh. A, doc. 16, pg. 89. Indeed, these letters are even referenced in the "Reasonable Assurance and Accountability Framework" section of the Chesapeake Bay TMDL. (AR 37831, 37832, 37835). Although EPA

---

[3] Documents identified in Exhibit A are ones that EPA has not included in the administrative record, but that Plaintiffs believe should be included in the record so the Court may accurately rule upon Defendants' dispositive motion and, ultimately, the merits of Plaintiffs' claims.

has agreed to include two of the letters in the record, the supplemental record index does not include the remainder of the communications between EPA and the Bay jurisdictions establishing the accountability framework and delineating the roles of the parties. *See, e.g.*, Exh. A, doc. 16, pg. 89; doc. 47, pg. 841; doc. 50, pg. 829; doc. 58, pg. 1117; doc. 59, pg. 1122.

The remaining, unfurnished communications are critical as they demonstrate how EPA intended to "ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain . . . the nutrient goals" of the Bay Agreement.  33 U.S.C. § 1267(g). Specifically, these documents describe EPA's intended approach to oversight and compliance and are part and parcel of the ongoing process intended to culminate in meeting pollution reduction targets by 2025 through mutual effort. *See* Exh. A, doc. 16, pg. 89. These documents establish the measures EPA would use to evaluate all the WIPs, including the Phase III WIPs at issue in this case. The administrative record compiled by EPA includes some, but not all, of these documents. For instances, key documents are missing that were before the agency as it assessed whether Pennsylvania and New York were on track to meet their respective commitments and what actions EPA needed to take against those jurisdictions for submitting deficient WIPs. Exh. A, doc. 1, pg. 1, EPA, Chesapeake Bay Compliance and Enforcement Strategy (May 12, 2010). Importantly, these earlier documents highlight how differently EPA interpreted and implemented its statutory role initially and how it has staked out a radically diminished role now. *See, e.g.*, Exh. A, doc. 16, pg. 89, Letter from EPA to Principals' Staff Committee (June 11, 2010); doc. 30, pg. 463, PSC Meeting Agenda (July 22, 2009); doc. 31, pg. 467, EPA Region Three, Fitting the Pieces Together, Executive Council Meeting (May 12, 2009).

B.      EPA Has Impermissibly Excluded Documents Developed During the Phase I and Phase II WIP Approval Processes.

 The Chesapeake Bay TMDL was designed to be implemented in three phases to achieve steady pollution reduction. The three phases of the watershed implementations plans are iterative and interrelated. The Phase I WIPs set the basin allocations for each jurisdiction and provided some actions and controls to be implemented by 2017, and then 2025. (AR 43662-63). The Phase II WIPs built upon the Phase I WIPs and provided even more detail regarding implementation measures at the local level that would achieve water quality standards. (AR 43668). The Phase III WIPs were developed after the midpoint assessment in 2017 and were designed to provide specific local actions that the "Bay jurisdictions intend to implement between 2018 and 2025 to meet the Bay restoration goals."[4]

EPA has assessed these iterative plans developed by the jurisdictions to ensure they will achieve the reductions necessary to meet water quality standards. Exh. A, doc. 13, pg. 77. However, EPA has failed to include in the record any documents chronicling the development and approval of the Phase I and Phase II WIPs, including the interim milestones designed to move each jurisdiction to the final goal of full implementation by 2025. As implementation of the Bay Total Maximum Daily Load is an "iterative process," *see, e.g.,* Defendants' Motion to Dismiss, at 28, EPA's evaluations of the first two phases are critical to understanding and evaluating its actions in the present case. Indeed, it would be arbitrary to segregate the Phase III process from the two phases that preceded it as EPA's acceptance of the final plans of each state to meet the 2025 deadline was predicated upon progress made during each prior phase. The

---

[4] EPA, *Chesapeake Bay Watershed Implementation Plans (WIPs)*, https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-watershed-implementation-plans-wips (last accessed Aug. 2, 2021).

administrative record is thus incomplete without these documents pertaining to the Phase I and

Phase II WIP approval process including two-year milestone progress.

       i.       *Certain Phase I and Phase II documents are already referenced in the*
                *administrative record index.*

A record is not complete if it does not include all documents before the agency, either

directly or indirectly, in making its decision. *Marcum,* 751 F. Supp. 2d at 78. While there is

generally a presumption that the agency has properly compiled the administrative record,

plaintiffs can rebut that presumption with a showing of deficiency. *Id.* Here, the presumption is

rebutted by EPA cherry-picking of documents to include in the record, combined with its

wholesale exclusion of documents cataloging the prior history of accountability by the Bay

jurisdictions and hands-on enforcement by EPA.

Documents currently in the administrative record show that when EPA evaluated the

adequacy of the Phase III WIPs, it referred to the Bay jurisdictions' actions during the

development and implementation of the Phase I and Phase II WIPs. (AR 3176, 38405, 38422).

Specifically, EPA has included its *expectations* for Phase I and Phase II WIPs in the record. (AR

38405, 38422). Those expectations underscore that to fulfill its statutory role, EPA necessarily

refers to prior WIPs to determine whether each jurisdiction has satisfied its previous

commitments. (AR 38405, 38422). For example, in the Phase II WIP expectation document,

EPA stated that its role is to "ensure that the Phase II WIPs provide at least as strong a

demonstration of reasonable assurance as in the Phase I WIPs and assess whether any

refinements to the Bay TMDL are necessary." (AR 38422).

Despite including the Phase I and Phase II WIP expectations, EPA has not included other

documents from those phases which explain EPA's rationale for approving those WIPs and,

ultimately, the Phase III WIPs. The administrative record is not complete without the Phase I and

Phase II WIP evaluations, as well as records of communications within EPA and between EPA and the Bay jurisdictions pertaining to the development and approval of the Phase I and Phase II WIPs. Indeed, these documents are central to Plaintiffs' core allegations that EPA acted arbitrarily by departing from past practice of holding states accountable in WIP development.[5]

    *ii.*    *The Phase III WIPs expressly look back to Phase I and Phase II.*

This iterative nature of the Bay TMDL WIP development process is perhaps best exemplified by EPA's own articulated expectations in Phase III.  In Phase III, EPA reviewed Phase I and Phase II commitments and actions by each jurisdiction to determine and set the expectations for the final phase. EPA's Phase III WIP expectation document stated:

> [A]s a result of past WIP and two-year milestone evaluations and new monitoring trends data, specific actions are needed in each jurisdiction, some more than others … Some jurisdictions need to do more under their Phase III WIPs because they did not meet their 2017 pollutant load reductions targets under their Phase II WIPs.

(AR 3176). In light of this, modeling efforts preceding the Phase III WIP process expressly considered what the jurisdictions had committed to in Phase II in order to assess "what additional reductions (or 'gaps') remain – if any – under their draft Phase III nitrogen planning targets." (AR 20913). And then, to evaluate the Phase III WIPs, including whether the plans submitted to the agency accounted for the targets not met in Phase II, EPA looked back to the earlier phases. (AR 3176). It would have been impossible for EPA to evaluate the Phase III WIPs without reference to prior plans and earlier milestone progress. Yet EPA is, in effect, promoting that position with its limited record.

---

[5] EPA provided evaluations for the Phase I and II WIPs for each jurisdiction and required revisions of Phase I WIPs that did not provide reasonable assurance that the TMDL goals would be met. *See Am. Farm Bureau Fed'n v, United States EPA,* 792 F.3d 281, 291-92 (3rd Cir. 2015).

Indeed, Pennsylvania and New York's Phase III WIPs themselves refer to their efforts under the Phase I and Phase II WIPs. Pennsylvania's Phase III WIP acknowledged that it "builds on strengths and seeks to address the weaknesses of the Phase [I] and Phase [II] WIPs." (AR 40305). Pennsylvania's Phase III WIP includes programs approved during the Phase II WIP process—namely its "Phase 2 Watershed Implementation Plan Nutrient Trading Program Supplement" and its "Phase 2 Watershed Implementation Plan Wastewater Supplement"—as a means to achieve its TMDL pollution reduction goals. (AR 40340-42); (AR 40362). For wastewater treatment plants specifically, Pennsylvania's Phase III WIP adopts the same treatment course developed in its Phase II WIP and makes no further adjustments to the program in the Phase III WIP. (AR 40362).

New York's Phase III WIP employs a similar structure, with programs created in the Phase I and Phase II WIPs carried over into Phase III. For instance, New York's Concentrated Animal Feeding Operation (CAFO) regulatory program and stream restoration programs are carried over from the Phase I and Phase II WIPs. (AR 37154). More specifically, the tillage goal in the Phase III WIP is directly based on the progress made in the Phase II WIP. (AR 37166). These are just a few illustrations of the interrelated nature of the three WIP phases. Moreover, they underscore that it is impossible to assess EPA's evaluation of the Phase III WIPs in a vacuum, without reference to and within the context of the Phase I and Phase II WIP processes.

      iii.    *The interim milestone evaluations illustrate the interconnected nature of all three WIP phases.*

Under the Bay TMDL, reduction of pollution levels was intended to be a continuous and incremental process, closely overseen by EPA. (AR 43662). Thus, the three-phase WIP process was further broken down into two-year milestones. These "progress reports" by the Bay jurisdictions enabled EPA to closely monitor whether state programs and resources were being

timely allocated to achieve the necessary reductions. The use of milestones enabled EPA to track each jurisdiction on a more granular level, consistent with annual budget and policy decisions made on the state level. *See* Exh. A, doc. 32, pg. 472, 2011 Milestones for Restoration, Chesapeake Bay Executive Council Meeting (May 12, 2009). The Bay jurisdictions, in turn, relied on EPA's oversight to ensure and enforce compliance so that each jurisdiction met its TMDL obligation.

At the beginning of each milestone period, each Bay jurisdiction submitted draft two-year milestones for EPA to review, comment, and approve. The draft milestones included an inventory of pollution reduction practices the jurisdiction intended to implement over the next two years, as well as programmatic updates to permit programs or proposed regulatory changes. EPA then used this inventory to estimate the amount of pollutants the jurisdiction would reduce and provided comments to the jurisdiction accordingly. Each jurisdiction then revised its milestones and submitted a final two-year milestone plan to EPA, which EPA then made publicly available. This process was fully envisioned by the Bay TMDL, the Bay Agreement and the Accountability Framework enumerated in the Bay TMDL. (AR 43911-12.)

To ensure even more granular EPA oversight, midway through the two-year milestone period, each jurisdiction submitted an inventory of newly completed implementation efforts from the past year. EPA used these inventories to further estimate nutrient and sediment reductions to determine whether sufficient progress had been made and whether EPA should employ certain backstop measures. This interim milestone evaluation occurred over several months, with significant communication between the EPA and the Bay jurisdictions regarding their progress. *See, e.g*., Exh. A, docs. 2 - 14, EPA assessments and evaluations of state milestones and WIP progress; doc. 37, EPA Evaluation of Maryland's Draft 2012-13 Milestones.  At the end of the

two-year milestone period, each jurisdiction submitted a final inventory to the EPA documenting its progress towards its milestone goals. As with the interim milestone evaluation, EPA evaluated that submission and published that evaluation.

EPA's evaluation of each jurisdiction's milestone achievements is a critical component of Bay TMDL implementation. Exh. A, doc. 29, pgs. 457 ("States and District must have controls in place to meet interim target by 2017; Demonstrates on track to meet final target load by 2025; EPA assess if 2-year milestones on schedule to meet interim and final target loads and imposes consequences as necessary") and 461 (Staged TMDL implementation); doc. 31, pg. 467-70, EPA Power Point, Fitting the Pieces Together; doc. 32, pg. 472-478 and 490-492, Corbin Power Point; doc. 35, pg. 506, Chesapeake Bay Backgrounder, 25 Years of the Chesapeake Bay Program Includes. Historically, EPA has used the milestone process to determine if the Bay jurisdictions are on track to meet their commitments, or alternatively, if EPA needed to step in and impose consequences under the accountability framework. EPA's compiled administrative record includes little documentation of the milestone process from before 2017, even though pollution reductions already achieved through the milestone plans bear directly on the level of effort needed in the Phase III WIPs. For example, during the interim evaluation process in 2017, EPA noted that Pennsylvania was behind in meeting its pollution reduction requirements in the agriculture and urban/suburban stormwater sectors and stated its expectation that the "Phase III Watershed Implementation Plan (WIP), combined with supporting two-year milestones, will address reductions needed from 2018 to 2025." (AR 38535). But as Plaintiffs allege, the Pennsylvania and New York Phase III WIPs have not been designed to meet the reductions needed by 2025. (Complaint, Doc. 1, *Chesapeake Bay Foundation v. EPA,* Case No. 1:20-cv-02529-CJN; Complaint, Doc. 1, *State of Maryland, et. al v. EPA,* Case No.1:20-cv-02530-CJN).

It is impossible to evaluate EPA's decision regarding the Phase III WIPs without the milestone progress assessments.

The gaps in the record EPA has compiled are only underscored by documents that the agency produced in response to a Freedom of Information Act request filed by Plaintiff Chesapeake Bay Foundation prior to the filing of the Complaint. That request sought, among other things, records concerning Pennsylvania and New York's Phase III WIPs.  The documents produced by EPA demonstrate that the WIP development and evaluation process is an intensive one, involving extensive back-and-forth between EPA and the Bay jurisdictions. Exh. D, FOIA Documents, doc. 1 and 2; *see also* (AR 1494-94, 33746-48). Similar documents doubtless were created as part of the Phase I and Phase II WIP development and evaluation processes.  Yet EPA's position would artificially constrain the record to exclude such documents altogether.

The administrative record must include documents that EPA considered directly and indirectly when making its decisions. By limiting the record to documents developed during the Phase III WIP evaluation process, EPA has told only part of the story, thereby hampering this Court's ability to evaluate Plaintiffs' claims that the approval of the Phase III WIP was arbitrary, capricious, and an unwarranted and unjustified departure from past agency practice. EPA's effort to exclude these earlier documents from the record would deprive the Court of evidence relevant to the scope of the agency's obligations under the TMDL, Bay Agreements and the Clean Water Act. That evidence would demonstrate an abrupt and unexplained change in behavior by EPA, contrary to its own established policies and protocols, constituting an abuse of discretion. EPA therefore has not properly compiled the administrative record and must complete it with documents covering the Phase I and Phase II WIP development and evaluation process.

## II.   IN THE ALTERNATIVE, THE MISSING DOCUMENTS SHOULD BE INCLUDED AS EXTRA-RECORD EVIDENCE.

Alternatively, if the Court finds that the above-described documents were not before the agency when it made its decision, it should consider these documents as extra-record evidence to evaluate Plaintiffs' claims.

While courts ordinarily are limited to reviewing the record before the agency when it made its decision, a party may seek to include "extra-judicial evidence that was not initially before the agency" but "believes should nonetheless be included in the administrative record." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015). Here, the moving party must "demonstrate unusual circumstances justifying a departure from the general rule" against considering extra-record evidence to supplement th[e] administrative record. " *Oceana I*, 290 F. Supp. at 77 (quoting *City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581, 590 (D.C. Cir. 2010)). The D.C. Circuit has recognized three such circumstances:

> (1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information [is] needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review.

 *City of Dania Beach*, 628 F.3d at 590.

The circumstances in this case warrant the inclusion of the documents as extra-record evidence, for all three of these reasons. As set forth above, EPA has deliberately excluded documents relating to the Phase I and Phase II WIP evaluation process that would undermine its decision to approve deficient Phase III plans. Past documents show that prior to 2019, EPA set clear expectations and addressed noncompliance by invoking consequences when prior WIPs were inadequate. *See supra,* Section I.B.ii. These documents also illustrate an arbitrary and unannounced change in agency practice between the Phase I and Phase II WIP evaluations, on

the one hand, and the Phase III WIP evaluations on the other. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-16 (2008).

The complexity of this case also requires extra-record evidence to provide context and as background information essential for the Court to determine whether the Agency considered all the relevant factors in approving the deficient plans. The Bay TMDL is unlike any other TMDL issued under the Clean Water Act – it is the "largest and most complex" TMDL. (AR 37846). It is also the only TMDL with a specific statutory structure and mandate. The categories of documents at issue here – documents related to the creation of the Bay TMDL Accountability Framework, as well as the Phase I and Phase II WIP development and milestones – all provide important history and context for the Court to evaluate Plaintiffs' claims. Without records showing how EPA and the Bay jurisdictions understood and defined their roles and obligations under the Accountability Framework, and how EPA performed its role in the Phase I and Phase II WIP development process, the Court cannot fully evaluate Plaintiffs' claims arising from Defendants' actions during the final Phase III process. The Court should therefore include these documents as extra-record evidence.

This case also presents a failure by EPA to follow its own policy for oversight of the Bay TMDL, which constitutes a failure to properly explain administrative action. If EPA can constrain the record to fit its purposes, then the Court cannot effectively review EPA's approval of deficient WIPs. The question before the Court in this lawsuit is not whether EPA's approval of deficient plans submitted by New York and Pennsylvania was a permissible way to handle non-compliance in the abstract.  Rather, the question is whether EPA's approval of deficient plans was arbitrary and capricious in light of EPA's prior policy and practice. Instead, EPA seeks to limit the Court to considering a narrow set of cherry-picked documents. Justice requires that

18

the Court review EPA's abrupt change in enforcement in the context of prior policy and practice involving the same Bay and watershed, the same jurisdictions, the same TMDL, the same sources of sediment, nitrogen, and phosphorous, and the same applicable laws.  Only with a full record, rather than the lopsided one compiled by EPA, can the Court determine whether EPA's shift from diligent oversight and enforcement to tolerance of non-compliance was an arbitrary and capricious action and an abuse of its discretionary enforcement authority.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion to complete or supplement the administrative record.

Dated: August 6, 2021

Respectfully submitted,

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Mathew P. Clagett*
MATTHEW P. CLAGETT
Assistant Attorney General
Office of the Attorney General Maryland
Department of the Environment
1800 Washington Boulevard
Suite 6048
Baltimore, MD 21230
(410) 537-3039 (phone)
(410) 537-3943 (fax)
matthew.clagett@maryland.gov

JOSHUA M. SEGAL
Special Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
(410) 576-6446
jsegal@oag.state.md.us

19

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

/s/ David S. Hoffmann
DAVID S. HOFFMANN
WESLEY ROSENFELD
Assistant Attorneys General
400 6th St. NW
Washington, D.C. 20001
(202) 727-0874 (phone)
(202) 730-1511 (fax)
David.Hoffmann@dc.gov

FOR THE COMMONWEALTH OF VIRGINIA

MARK HERRING
Attorney General

DONALD D. ANDERSON
Deputy Attorney General

PAUL KUGELMAN, JR.
Sr. Asst. Attorney General and Section Chief

/s/ Jerald R. Hess
JERALD R. HESS
Assistant Attorney General
Environmental Section
202 North 9th Street
Richmond, VA 23219
(804) 371-8329
JHess@oag.state.va.us

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

Deputy Attorney General
RALPH K. DURSTEIN III

20

*/s/ Christian Wright*
CHRISTIAN WRIGHT
Director of Impact Litigation
820 N. French St.
Wilmington, DE 19801


FOR THE CHESAPEAKE BAY FOUNDATION,
INC., MARYLAND WATERMEN'S
ASSOCIATION, ROBERT WHITESCARVER,
JEANNE HOFFMAN

*/s/ Jon A. Mueller*
JON A. MUELLER - D.C. Bar No. 981443
PAUL SMAIL - D.C. Federal Bar No. MD0061
BRITTANY WRIGHT - M.D. Bar No.
1612140074
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(443) 482-216
jmueller@cbf.org
psmail@cbf.org
bwright@cbf.org


FOR ANNE ARUNDEL COUNTY,
MARYLAND

*/s/ Hamilton F. Tyler*
Hamilton F. Tyler
D.C. Federal Bar No. 433122
Deputy County Attorney
Anne Arundel County Office of Law
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
(410) 222-7888
htyler@aacounty.org

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2021, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ Jon A. Mueller
Jon A. Mueller